UNITED STATES *v.* GUEST ET AL.

No. 65.   Argued November 9, 1965.—
Decided March 28, 1966.

*Solicitor General Marshall* argued the cause for the United States. With him on the brief were *Assistant Attorney General Doar, Louis F. Claiborne* and *David Rubin.*

*Charles J. Bloch,* by appointment of the Court, 380 U. S. 969, argued the cause and filed a brief for appellee Lackey.

*James E. Hudson* argued the cause and filed a brief for appellees Guest et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

The six defendants in this case were indicted by a United States grand jury in the Middle District of

Georgia for criminal conspiracy in violation of 18 U. S. C. § 241 (1964 ed.). That section provides in relevant part:

> "If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;
>
> . . . . .
>
> "They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

In five numbered paragraphs, the indictment alleged a single conspiracy by the defendants to deprive Negro citizens of the free exercise and enjoyment of several specified rights secured by the Constitution and laws of the United States.[1] The defendants moved to dismiss

---

[1] The indictment, filed on October 16, 1964, was as follows:

"THE GRAND JURY CHARGES:

"Commencing on or about January 1, 1964, and continuing to the date of this indictment, HERBERT GUEST, JAMES SPERGEON LACKEY, CECIL WILLIAM MYERS, DENVER WILLIS PHILLIPS, JOSEPH HOWARD SIMS, and GEORGE HAMPTON TURNER, did, within the Middle District of Georgia, Athens Division, conspire together, with each other, and with other persons to the Grand Jury unknown, to injure, oppress, threaten, and intimidate Negro citizens of the United States in the vicinity of Athens, Georgia, in the free exercise and enjoyment by said Negro citizens of the following rights and privileges secured to them by the Constitution and laws of the United States:

"1. The right to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of motion picture theaters, restaurants, and other places of public accommodation;

"2. The right to the equal utilization, without discrimination upon the basis of race, of public facilities in the vicinity of Athens, Georgia,

the indictment on the ground that it did not charge an offense under the laws of the United States. The District Court sustained the motion and dismissed the indictment as to all defendants and all numbered paragraphs of the indictment. 246 F. Supp. 475.

---

owned, operated or managed by or on behalf of the State of Georgia or any subdivision thereof;

"3. The right to the full and equal use on the same terms as white citizens of the public streets and highways in the vicinity of Athens, Georgia;

"4. The right to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of interstate commerce within the State of Georgia;

"5. Other rights exercised and enjoyed by white citizens in the vicinity of Athens, Georgia.

"It was a part of the plan and purpose of the conspiracy that its objects be achieved by various means, including the following:

"1. By shooting Negroes;

"2. By beating Negroes;

"3. By killing Negroes;

"4. By damaging and destroying property of Negroes;

"5. By pursuing Negroes in automobiles and threatening them with guns;

"6. By making telephone calls to Negroes to threaten their lives, property, and persons, and by making such threats in person;

"7. By going in disguise on the highway and on the premises of other persons;

"8. By causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts; and

"9. By burning crosses at night in public view.

"All in violation of Section 241, Title 18, United States Code."

The only additional indication in the record concerning the factual details of the conduct with which the defendants were charged is the statement of the District Court that: "It is common knowledge that two of the defendants, Sims and Myers, have already been prosecuted in the Superior Court of Madison County, Georgia for the murder of Lemuel A. Penn and by a jury found not guilty." 246 F. Supp. 475, 487.

The United States appealed directly to this Court under the Criminal Appeals Act, 18 U. S. C. § 3731.[2] We postponed decision of the question of our jurisdiction to the hearing on the merits. 381 U. S. 932. It is now apparent that this Court does not have jurisdiction to decide one of the issues sought to be raised on this direct appeal. As to the other issues, however, our appellate jurisdiction is clear, and for the reasons that follow, we reverse the judgment of the District Court. As in *United States* v. *Price, post,* p. 787, decided today, we deal here with issues of statutory construction, not with issues of constitutional power.

## I.

The first numbered paragraph of the indictment, reflecting a portion of the language of § 201 (a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a (a) (1964 ed.), alleged that the defendants conspired to injure, oppress, threaten, and intimidate Negro citizens in the free exercise and enjoyment of:

> "The right to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of motion picture theaters, restaurants, and other places of public accommodation." [3]

---

[2] This appeal concerns only the first four numbered paragraphs of the indictment. The Government conceded in the District Court that the fifth paragraph added nothing to the indictment, and no question is raised here as to the dismissal of that paragraph.

[3] Section 201 (a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a (a) (1964 ed.), provides:

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

The criteria for coverage of motion picture theaters by the Act are stated in §§ 201 (b)(3) and 201 (c)(3), 42 U. S. C. §§ 2000a

The District Court held that this paragraph of the indictment failed to state an offense against rights secured by the Constitution or laws of the United States. The court found a fatal flaw in the failure of the paragraph to include an allegation that the acts of the defendants were motivated by racial discrimination, an allegation the court thought essential to charge an interference with rights secured by Title II of the Civil Rights Act of 1964.[4] The court went on to say that, in any event, 18 U. S. C. § 241 is not an available sanction to protect rights secured by that title because § 207 (b) of the 1964 Act, 42 U. S. C. § 2000a–6 (b) (1964 ed.), specifies that the remedies provided in Title II itself are

(b) (3) and 2000a (c) (3) (1964 ed.); the criteria for coverage of restaurants are stated in §§ 201 (b) (2) and 201 (c) (2), 42 U. S. C. §§ 2000a (b) (2) and 2000a (c) (2) (1964 ed.). No issue is raised here as to the failure of the indictment to allege specifically that the Act is applicable to the places of public accommodation described in this paragraph of the indictment.

[4] The District Court said: "The Government contends that the rights enumerated in paragraph 1 stem from Title 2 of the Civil Rights Act of 1964, and thus automatically come within the purview of § 241. The Government conceded on oral argument that paragraph one would add nothing to the indictment absent the Act. It is not clear how the rights mentioned in paragraph one can be said to come from the Act because § 201 (a), upon which the draftsman doubtless relied, lists the essential element 'without discrimination or segregation on the ground of race, color, religion, or national origin.' This element is omitted from paragraph one of the indictment, and does not appear in the charging part of the indictment. The Supreme Court said in Cruikshank, supra, 92 U. S. at page 556, where deprivation of right to vote was involved,

" 'We may suspect that "race" was the cause of the hostility; but it is not so averred. This is material to a description of the substance of the offense and cannot be supplied by implication. Everything essential must be charged positively, not inferentially. The defect here is not in form, but in substance.' " 246 F. Supp. 475, 484.

to be the exclusive means of enforcing the rights the title secures.[5]

A direct appeal to this Court is available to the United States under the Criminal Appeals Act, 18 U. S. C. § 3731, from "a decision or judgment . . . dismissing any indictment . . . or any count thereof, where such decision or judgment is based upon the . . . construction of the statute upon which the indictment . . . is founded." In the present case, however, the District Court's judgment as to the first paragraph of the indictment was based, at least alternatively, upon its determination that this paragraph was defective as a matter of pleading. Settled principles of review under the Criminal Appeals Act therefore preclude our review of the District Court's judgment on this branch of the indictment. In *United States* v. *Borden Co.,* 308 U. S. 188, Chief Justice Hughes, speaking for a unanimous Court, set out these principles with characteristic clarity:

> "The established principles governing our review are these: (1) Appeal does not lie from a judgment which rests on the mere deficiencies of the indict-

---

[5] Section 207 (b) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a-6 (b) (1964 ed.), states:

"The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right."

Relying on this provision and its legislative history, the District Court said: "It seems crystal clear that the Congress in enacting the Civil Rights Act of 1964 did not intend to subject anyone to any possible criminal penalties except those specifically provided for in the Act itself." 246 F. Supp., at 485.

ment as a pleading, as distinguished from a construction of the statute which underlies the indictment. (2) Nor will an appeal lie in a case where the District Court has considered the construction of the statute but has also rested its decision upon the independent ground of a defect in pleading which is not subject to our examination. In that case we cannot disturb the judgment and the question of construction becomes abstract. (3) This Court must accept the construction given to the indictment by the District Court as that is a matter we are not authorized to review. . . ." 308 U. S., at 193.

See also *United States* v. *Swift & Co.,* 318 U. S. 442, 444.

The result is not changed by the circumstance that we have jurisdiction over this appeal as to the other paragraphs of the indictment. *United States* v. *Borden, supra,* involved an indictment comparable to the present one for the purposes of jurisdiction under the Criminal Appeals Act. In *Borden,* the District Court had held all four counts of the indictment invalid as a matter of construction of the Sherman Act, but had also held the third count defective as a matter of pleading. The Court accepted jurisdiction on direct appeal as to the first, second, and fourth counts of the indictment, but it dismissed the appeal as to the third count for want of jurisdiction. "The Government's appeal does not open the whole case." 308 U. S. 188, 193.

It is hardly necessary to add that our ruling as to the Court's lack of jurisdiction now to review this aspect of the case implies no opinion whatsoever as to the correctness either of the District Court's appraisal of this paragraph of the indictment as a matter of pleading or of the court's view of the preclusive effect of § 207 (b) of the Civil Rights Act of 1964.

## II.

The second numbered paragraph of the indictment alleged that the defendants conspired to injure, oppress, threaten, and intimidate Negro citizens of the United States in the free exercise and enjoyment of:

> "The right to the equal utilization, without discrimination upon the basis of race, of public facilities in the vicinity of Athens, Georgia, owned, operated or managed by or on behalf of the State of Georgia or any subdivision thereof."

Correctly characterizing this paragraph as embracing rights protected by the Equal Protection Clause of the Fourteenth Amendment, the District Court held as a matter of statutory construction that 18 U. S. C. § 241 does not encompass any Fourteenth Amendment rights, and further held as a matter of constitutional law that "any broader construction of § 241 . . . would render it void for indefiniteness." 246 F. Supp., at 486. In so holding, the District Court was in error, as our opinion in *United States* v. *Price, post,* p. 787, decided today, makes abundantly clear.

To be sure, *Price* involves rights under the Due Process Clause, whereas the present case involves rights under the Equal Protection Clause. But no possible reason suggests itself for concluding that § 241—if it protects Fourteenth Amendment rights—protects rights secured by the one Clause but not those secured by the other. We have made clear in *Price* that when § 241 speaks of "any right or privilege secured . . . by the Constitution or laws of the United States," it means precisely that.

Moreover, inclusion of Fourteenth Amendment rights within the compass of 18 U. S. C. § 241 does not render the statute unconstitutionally vague. Since the gravamen of the offense is conspiracy, the requirement that the offender must act with a specific intent to inter-

fere with the federal rights in question is satisfied. *Screws* v. *United States,* 325 U. S. 91; *United States* v. *Williams,* 341 U. S. 70, 93–95 (dissenting opinion). And the rights under the Equal Protection Clause described by this paragraph of the indictment have been so firmly and precisely established by a consistent line of decisions in this Court,[6] that the lack of specification of these rights in the language of § 241 itself can raise no serious constitutional question on the ground of vagueness or indefiniteness.

Unlike the indictment in *Price,* however, the indictment in the present case names no person alleged to have acted in any way under the color of state law. The argument is therefore made that, since there exist no Equal Protection Clause rights against wholly private action, the judgment of the District Court on this branch of the case must be affirmed. On its face, the argument is unexceptionable. The Equal Protection Clause speaks to the State or to those acting under the color of its authority.[7]

In this connection, we emphasize that § 241 by its clear language incorporates no more than the Equal Protection Clause itself; the statute does not purport to give substantive, as opposed to remedial, implementation to

---

[6] See, *e. g., Brown* v. *Board of Education,* 347 U. S. 483 (schools); *New Orleans City Park Improvement Assn.* v. *Detiege,* 358 U. S. 54, *Wright* v. *Georgia,* 373 U. S. 284, *Watson* v. *Memphis,* 373 U. S. 526, *City of New Orleans* v. *Barthe,* 376 U. S. 189 (parks and playgrounds); *Holmes* v. *City of Atlanta,* 350 U. S. 879 (golf course); *Mayor and City Council of Baltimore City* v. *Dawson,* 350 U. S. 877 (beach); *Muir* v. *Louisville Park Theatrical Assn.,* 347 U. S. 971 (auditorium); *Johnson* v. *Virginia,* 373 U. S. 61 (courthouse); *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (parking garage); *Turner* v. *City of Memphis,* 369 U. S. 350 (airport).

[7] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

any rights secured by that Clause.[8]   Since we therefore
deal here only with the bare terms of the Equal Protec-
tion Clause itself, nothing said in this opinion goes to
the question of what kinds of other and broader legisla-
tion Congress might constitutionally enact under § 5 of
the Fourteenth Amendment to implement that Clause or
any other provision of the Amendment.[9]

It is a commonplace that rights under the Equal Pro-
tection Clause itself arise only where there has been in-
volvement of the State or of one acting under the color of
its authority.   The Equal Protection Clause "does not . . .
add any thing to the rights which one citizen has under
the Constitution against another." *United States* v.
*Cruikshank,* 92 U. S. 542, 554–555.   As MR. JUSTICE
DOUGLAS more recently put it, "The Fourteenth Amend-
ment protects the individual against *state action,* not
against wrongs done by *individuals." United States* v.
*Williams,* 341 U. S. 70, 92 (dissenting opinion).   This
has been the view of the Court from the beginning.
*United States* v. *Cruikshank, supra; United States* v.
*Harris,* 106 U. S. 629; *Civil Rights Cases,* 109 U. S. 3;
*Hodges* v. *United States,* 203 U. S. 1; *United States* v.
*Powell,* 212 U. S. 564.   It remains the Court's view
today.   See, *e. g., Evans* v. *Newton,* 382 U. S. 296;
*United States* v. *Price, post,* p. 787.

This is not to say, however, that the involvement of
the State need be either exclusive or direct.   In a variety
of situations the Court has found state action of a nature
sufficient to create rights under the Equal Protection
Clause even though the participation of the State was pe-
ripheral, or its action was only one of several co-operative

---

[8] See p. 747, *supra.*

[9] Thus, contrary to the suggestion in MR. JUSTICE BRENNAN's
separate opinion, nothing said in this opinion has the slightest bear-
ing on the validity or construction of Title III or Title IV of the
Civil Rights Act of 1964, 42 U. S. C. §§ 2000b, 2000c (1964 ed.).

forces leading to the constitutional violation. See, *e. g.*, *Shelley* v. *Kraemer,* 334 U. S. 1; *Pennsylvania* v. *Board of Trusts,* 353 U. S. 230; *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715; *Peterson* v. *City of Greenville,* 373 U. S. 244; *Lombard* v. *Louisiana,* 373 U. S. 267; *Griffin* v. *Maryland,* 378 U. S. 130; *Robinson* v. *Florida,* 378 U. S. 153; *Evans* v. *Newton, supra.*

This case, however, requires no determination of the threshold level that state action must attain in order to create rights under the Equal Protection Clause. This is so because, contrary to the argument of the litigants, the indictment in fact contains an express allegation of state involvement sufficient at least to require the denial of a motion to dismiss. One of the means of accomplishing the object of the conspiracy, according to the indictment, was "By causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts." [10] In *Bell* v. *Maryland,* 378 U. S. 226, three members of the Court expressed the view that a private businessman's invocation of state police and judicial action to carry out his own policy of racial discrimination was sufficient to create Equal Protection Clause rights in those against whom the racial discrimination was directed.[11] Three other members of the Court strongly disagreed with that view,[12] and three expressed no opinion on the question. The allegation of the extent of official involvement in the present case is not clear. It may charge no more than co-operative private and state action similar to that involved in *Bell,* but it may go considerably further. For example, the allegation is broad enough to cover a charge of active connivance by agents of the State in the making of the "false reports," or other conduct amount-

---

[10] See note 1, *supra.*

[11] 378 U. S. 226, at 242 (separate opinion of MR. JUSTICE DOUGLAS); *id.,* at 286 (separate opinion of Mr. Justice Goldberg).

[12] *Id.,* at 318 (dissenting opinion of MR. JUSTICE BLACK).

ing to official discrimination clearly sufficient to constitute denial of rights protected by the Equal Protection Clause. Although it is possible that a bill of particulars, or the proof if the case goes to trial, would disclose no co-operative action of that kind by officials of the State, the allegation is enough to prevent dismissal of this branch of the indictment.

## III.

The fourth numbered paragraph of the indictment alleged that the defendants conspired to injure, oppress, threaten, and intimidate Negro citizens of the United States in the free exercise and enjoyment of:

> "The right to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of interstate commerce within the State of Georgia." [13]

The District Court was in error in dismissing the indictment as to this paragraph. The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. In *Crandall* v. *Nevada*, 6 Wall. 35, invali-

---

[13] The third numbered paragraph alleged that the defendants conspired to injure, oppress, threaten, and intimidate Negro citizens of the United States in the free exercise and enjoyment of:

"The right to the full and equal use on the same terms as white citizens of the public streets and highways in the vicinity of Athens, Georgia."

Insofar as the third paragraph refers to the use of local public facilities, it is covered by the discussion of the second numbered paragraph of the indictment in Part II of this opinion. Insofar as the third paragraph refers to the use of streets or highways in interstate commerce, it is covered by the present discussion of the fourth numbered paragraph of the indictment.

dating a Nevada tax on every person leaving the State by common carrier, the Court took as its guide the statement of Chief Justice Taney in the *Passenger Cases*, 7 How. 283, 492:

> "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."

See 6 Wall., at 48–49.

Although the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State," [14] that right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.[15] In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution. See *Williams* v. *Fears*, 179 U. S. 270, 274; *Twining* v. *New Jersey*, 211 U. S. 78, 97; *Edwards* v. *California*, 314 U. S. 160, 177 (concurring opinion), 181 (concurring opinion); *New York* v. *O'Neill*, 359 U. S. 1, 6–8; 12–16 (dissenting opinion).

In *Edwards* v. *California*, 314 U. S. 160, invalidating a California law which impeded the free interstate passage of the indigent, the Court based its reaffirmation of the federal right of interstate travel upon the Commerce Clause. This ground of decision was consistent with precedents firmly establishing that the federal com-

---

[14] Art. IV, Articles of Confederation.

[15] See Chafee, Three Human Rights in the Constitution of 1787, at 185 (1956).

merce power surely encompasses the movement in interstate commerce of persons as well as commodities. *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, 203; *Covington & Cincinnati Bridge Co.* v. *Kentucky,* 154 U. S. 204, 218–219; *Hoke* v. *United States,* 227 U. S. 308, 320; *United States* v. *Hill,* 248 U. S. 420, 423. It is also well settled in our decisions that the federal commerce power authorizes Congress to legislate for the protection of individuals from violations of civil rights that impinge on their free movement in interstate commerce. *Mitchell* v. *United States,* 313 U. S. 80; *Henderson* v. *United States,* 339 U. S. 816; *Boynton* v. *Virginia,* 364 U. S. 454; *Atlanta Motel* v. *United States,* 379 U. S. 241; *Katzenbach* v. *McClung,* 379 U. S. 294.

Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further.[16] All have agreed that the right exists. Its explicit recognition as one of the federal rights protected by what is now 18 U. S. C. § 241 goes back at least as far as 1904. *United States* v. *Moore,* 129 F. 630, 633. We reaffirm it now.[17]

---

[16] The District Court relied heavily on *United States* v. *Wheeler,* 254 U. S. 281, in dismissing this branch of the indictment. That case involved an alleged conspiracy to compel residents of Arizona to move out of that State. The right of interstate travel was, therefore, not directly involved. Whatever continuing validity *Wheeler* may have as restricted to its own facts, the dicta in the *Wheeler* opinion relied on by the District Court in the present case have been discredited in subsequent decisions. Cf. *Edwards* v. *California,* 314 U. S. 160, 177, 180 (DOUGLAS, J., concurring); *United States* v. *Williams,* 341 U. S. 70, 80.

[17] As emphasized in MR. JUSTICE HARLAN's separate opinion, § 241 protects only against interference with rights secured by other federal laws or by the Constitution itself. The right to interstate travel is a right that the Constitution itself guarantees, as the cases cited in the text make clear. Although these cases in fact involved governmental interference with the right of free interstate travel,

This does not mean, of course, that every criminal conspiracy affecting an individual's right of free interstate passage is within the sanction of 18 U. S. C. § 241. A specific intent to interfere with the federal right must be proved, and at a trial the defendants are entitled to a jury instruction phrased in those terms. *Screws* v. *United States*, 325 U. S. 91, 106–107. Thus, for example, a conspiracy to rob an interstate traveler would not, of itself, violate § 241. But if the predominant purpose of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought. Accordingly, it was error to grant the motion to dismiss on this branch of the indictment.

For these reasons, the judgment of the District Court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

---

their reasoning fully supports the conclusion that the constitutional right of interstate travel is a right secured against interference from any source whatever, whether governmental or private. In this connection, it is important to reiterate that the right to travel freely from State to State finds constitutional protection that is quite independent of the Fourteenth Amendment.

We are not concerned here with the extent to which interstate travel may be regulated or controlled by the exercise of a State's police power acting within the confines of the Fourteenth Amendment. See *Edwards* v. *California*, 314 U. S. 160, 184 (concurring opinion); *New York* v. *O'Neill*, 359 U. S. 1, 6–8. Nor is there any issue here as to the permissible extent of federal interference with the right within the confines of the Due Process Clause of the Fifth Amendment. Cf. *Zemel* v. *Rusk*, 381 U. S. 1; *Aptheker* v. *Secretary of State*, 378 U. S. 500; *Kent* v. *Dulles*, 357 U. S. 116.

MR. JUSTICE CLARK, with whom MR. JUSTICE BLACK
and MR. JUSTICE FORTAS join, concurring.

I join the opinion of the Court in this case but believe
it worthwhile to comment on its Part II in which the
Court discusses that portion of the indictment charging
the appellees with conspiring to injure, oppress, threaten
and intimidate Negro citizens of the United States in the
free exercise and enjoyment of:

> "The right to the equal utilization, without dis-
> crimination upon the basis of race, of public facilities
> in the vicinity of Athens, Georgia, owned, operated
> or managed by or on behalf of the State of Georgia
> or any subdivision thereof."

The appellees contend that the indictment is invalid
since 18 U. S. C. § 241, under which it was returned, pro-
tects only against interference with the exercise of the
right to equal utilization of state facilities, which is not
a right "secured" by the Fourteenth Amendment in the
absence of state action. With respect to this contention
the Court upholds the indictment on the ground that it
alleges the conspiracy was accomplished, in part, "[b]y
causing the arrest of Negroes by means of false reports
that such Negroes had committed criminal acts." The
Court reasons that this allegation of the indictment
might well cover active connivance by agents of the
State in the making of these false reports or in carrying
on other conduct amounting to official discrimination.
By so construing the indictment, it finds the language
sufficient to cover a denial of rights protected by the
Equal Protection Clause. The Court thus removes from
the case any necessity for a "determination of the
threshold level that state action must attain in order to
create rights under the Equal Protection Clause." A
study of the language in the indictment clearly shows

762

that the Court's construction is not a capricious one, and I therefore agree with that construction, as well as the conclusion that follows.

The Court carves out of its opinion the question of the power of Congress, under § 5 of the Fourteenth Amendment, to enact legislation implementing the Equal Protection Clause or any other provision of the Fourteenth Amendment. The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, such as the right to utilize public facilities. My Brother BRENNAN, however, says that the Court's disposition constitutes an acceptance of appellees' aforesaid contention as to § 241. Some of his language further suggests that the Court indicates *sub silentio* that Congress does not have the power to outlaw such conspiracies. Although the Court specifically rejects any such connotation, *ante,* p. 755, it is, I believe, both appropriate and necessary under the circumstances here to say that there now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

I join Parts I and II [1] of the Court's opinion, but I cannot subscribe to Part III in its full sweep. To the extent that it is there held that 18 U. S. C. § 241 (1964 ed.) reaches conspiracies, embracing only the action of

---

[1] The action of three of the Justices who join the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in Part II seems to me, to say the very least, extraordinary.

private persons, to obstruct or otherwise interfere with the right of citizens freely to engage in interstate travel, I am constrained to dissent. On the other hand, I agree that § 241 does embrace state interference with such interstate travel, and I therefore consider that this aspect of the indictment is sustainable on the reasoning of Part II of the Court's opinion.

This right to travel must be found in the Constitution itself. This is so because § 241 covers only conspiracies to interfere with any citizen in the "free exercise or enjoyment" of a right or privilege "secured to him by the Constitution or laws of the United States," and no "right to travel" can be found in § 241 or in any other law of the United States. My disagreement with this phase of the Court's opinion lies in this: While past cases do indeed establish that there is a constitutional "right to travel" between States free from unreasonable *governmental* interference, today's decision is the first to hold that such movement is also protected against *private* interference, and, depending on the constitutional source of the right, I think it either unwise or impermissible so to read the Constitution.

Preliminarily, nothing in the Constitution expressly secures the right to travel. In contrast the Articles of Confederation provided in Art. IV:

> "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States . . . shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively . . . ."

This right to "free ingress and regress" was eliminated from the draft of the Constitution without discussion even though the main objective of the Convention. was to create a stronger union. It has been assumed that the clause was dropped because it was so obviously an essential part of our federal structure that it was necessarily subsumed under more general clauses of the Constitution. See *United States* v. *Wheeler,* 254 U. S. 281, 294. I propose to examine the several asserted constitutional bases for the right to travel, and the scope of its protection in relation to each source.

I.

Because of the close proximity of the right of ingress and regress to the Privileges and Immunities Clause of the Articles of Confederation it has long been declared that the right is a privilege and immunity of national citizenship under the Constitution. In the influential opinion of Mr. Justice Washington on circuit, *Corfield* v. *Coryell,* 4 Wash. C. C. 371 (1825), the court addressed itself to the question—"what are the privileges and immunities of citizens in the several states?" *Id.,* at 380. *Corfield* was concerned with a New Jersey statute restricting to state citizens the right to rake for oysters, a statute which the court upheld. In analyzing the Privileges and Immunities Clause of the Constitution, Art. IV, § 2, the court stated that it confined "these expressions to those privileges and immunities which are, in their nature, *fundamental,*" and listed among them "The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise . . . ." *Id.,* at 380–381.

The dictum in *Corfield* was given general approval in the first opinion of this Court to deal directly with the right of free movement, *Crandall* v. *Nevada,* 6 Wall. 35,

which struck down a Nevada statute taxing persons leaving the State. It is first noteworthy that in his concurring opinion Mr. Justice Clifford asserted that he would hold the statute void exclusively on commerce grounds for he was clear "that the State legislature cannot impose any such burden upon commerce among the several States." 6 Wall., at 49. The majority opinion of Mr. Justice Miller, however, eschewed reliance on the Commerce Clause and the Import-Export Clause and looked rather to the nature of the federal union:

> "The people of these United States constitute one nation. . . . This government has necessarily a capital established by law . . . . That government has a right to call to this point any or all of its citizens to aid in its service . . . . The government, also, has its offices of secondary importance in all other parts of the country. On the sea-coasts and on the rivers it has its ports of entry. In the interior it has its land offices, its revenue offices, and its sub-treasuries. In all these it demands the services of its citizens, and is entitled to bring them to those points from all quarters of the nation, and no power can exist in a State to obstruct this right that would not enable it to defeat the purposes for which the government was established." 6 Wall., at 43–44.

Accompanying this need of the Federal Government, the Court found a correlative right of the citizen to move unimpeded throughout the land:

> "He has the right to come to the seat of government to assert any claim he may have upon that government, or to transact any business he may have with it. To seek its protection, to share its offices, to engage in administering its functions. He has a right to free access to its sea-ports, through which all the operations of foreign trade and commerce are

> conducted, to the sub-treasuries, the land offices, the revenue offices, and the courts of justice in the several States, and this right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it." 6 Wall., at 44.

The focus of that opinion, very clearly, was thus on impediments by the States on free movement by citizens. This is emphasized subsequently when Mr. Justice Miller asserts that this approach is "neither novel nor unsupported by authority," because it is, fundamentally, a question of the exercise of a State's taxing power to obstruct the functions of the Federal Government: "[T]he right of the States in this mode to impede or embarrass the constitutional operations of that government, or the rights which its citizens hold under it, has been uniformly denied." 6 Wall., at 44–45.

Later cases, alluding to privileges and immunities, have in dicta included the right to free movement. See *Paul v. Virginia,* 8 Wall. 168, 180; *Williams v. Fears,* 179 U. S. 270, 274; *Twining v. New Jersey,* 211 U. S. 78.

Although the right to travel thus has respectable precedent to support its status as a privilege and immunity of national citizenship, it is important to note that those cases all dealt with the right of travel simply as affected by oppressive *state* action. Only one prior case in this Court, *United States v. Wheeler,* 254 U. S. 281, was argued precisely in terms of a right to free movement as against interference by private individuals. There the Government alleged a conspiracy under the predecessor of § 241 against the perpetrators of the notorious Bisbee Deportations.[2] The case was argued straightforwardly in terms of whether the right to free ingress and

---

[2] For a discussion of the deportations, see The President's Mediation Comm'n, Report on the Bisbee Deportations (November 6, 1917).

egress, admitted by both parties to be a right of national citizenship, was constitutionally guaranteed against private conspiracies. The Brief for the Defendants in Error, whose counsel was Charles Evans Hughes, later Chief Justice of the United States, gives as one of its main points: "So far as there is a right pertaining to Federal citizenship to have free ingress or egress with respect to the several States, the right is essentially one of protection against the action of the States themselves and of those acting under their authority." Brief, at p. i. The Court, with one dissent, accepted this interpretation of the right of unrestricted interstate movement, observing that *Crandall* v. *Nevada, supra,* was inapplicable because, *inter alia,* it dealt with state action. 254 U. S., at 299. More recent cases discussing or applying the right to interstate travel have always been in the context of oppressive state action. See, *e. g., Edwards* v. *California,* 314 U. S. 160, and other cases discussed, *infra.*[3]

It is accordingly apparent that the right to unimpeded interstate travel, regarded as a privilege and immunity of national citizenship, was historically seen as a method of breaking down state provincialism, and facilitating the creation of a true federal union. In the one case in which a private conspiracy to obstruct such movement was heretofore presented to this Court, the predecessor of the very statute we apply today was held not to encompass such a right.

## II.

A second possible constitutional basis for the right to move among the States without interference is the Commerce Clause. When Mr. Justice Washington articulated

---

[3] The Court's reliance on *United States* v. *Moore,* 129 F. 630, is misplaced. That case held only that it was not a privilege or immunity to organize labor unions. The reference to "the right to pass from one state to any other" was purely incidental dictum.

the right in *Corfield*, it was in the context of a state statute impeding economic activity by outsiders, and he cast his statement in economic terms. 4 Wash. C. C., at 380–381. The two concurring Justices in *Crandall* v. *Nevada, supra*, rested solely on the commerce argument, indicating again the close connection between freedom of commerce and travel as principles of our federal union. In *Edwards* v. *California*, 314 U. S. 160, the Court held squarely that the right to unimpeded movement of persons is guaranteed against oppressive state legislation by the Commerce Clause, and declared unconstitutional a California statute restricting the entry of indigents into that State.

Application of the Commerce Clause to this area has the advantage of supplying a longer tradition of case law and more refined principles of adjudication. States do have rights of taxation and quarantine, see *Edwards* v. *California*, 314 U. S., at 184 (concurring opinion), which must be weighed against the general right of free movement, and Commerce Clause adjudication has traditionally been the means of reconciling these interests. Yet this approach to the right to travel, like that found in the privileges and immunities cases, is concerned with the interrelation of state and federal power, not—with an exception to be dealt with in a moment—with private interference.

The case of *In re Debs*, 158 U. S. 564, may be thought to raise some doubts as to this proposition. There the United States sought to enjoin Debs and members of his union from continuing to obstruct—by means of a strike—interstate commerce and the passage of the mails. The Court held that Congress and the Executive could certainly act to keep the channels of interstate commerce open, and that a court of equity had no less power to enjoin what amounted to a public nuisance. It might

be argued that to the extent *Debs* permits the Federal Government to obtain an injunction against the private conspiracy alleged in the present indictment,[4] the criminal statute should be applicable as well on the ground that the governmental interest in both cases is the same, namely to vindicate the underlying policy of the Commerce Clause. However, § 241 is not directed toward the vindication of governmental interests; it requires a private right under federal law. No such right can be found in *Debs,* which stands simply for the proposition that the Commerce Clause gives the Federal Government standing to sue on a basis similar to that of private individuals under nuisance law. The substantive rights of private persons to enjoin such impediments, of course, devolve from state not federal law; any seemingly inconsistent discussion in *Debs* would appear substantially vitiated by *Erie R. Co.* v. *Tompkins,* 304 U. S. 64.

I cannot find in any of this past case law any solid support for a conclusion that the Commerce Clause embraces a right to be free from private interference. And the Court's opinion here makes no such suggestion.

### III.

One other possible source for the right to travel should be mentioned. Professor Chafee, in his thoughtful study, "Freedom of Movement," [5] finds both the privileges and immunities approach and the Commerce Clause approach unsatisfactory. After a thorough review of the history

---

[4] It is not even clear that an equity court would enjoin a conspiracy of the kind alleged here, for traditionally equity will not enjoin a crime. See Developments in the Law—Injunctions, 78 Harv. L. Rev. 994, 1013–1018 (1965).

[5] In Three Human Rights in the Constitution of 1787, at 162 (1956).

and cases dealing with the question he concludes that this "valuable human right," *id.*, at 209, is best seen in due process terms:

> "Already in several decisions the Court has used the Due Process Clause to safeguard the right of the members of any race to reside where they please inside a state, regardless of ordinances and injunctions. Why is not this clause equally available to assure the right to live in any state one desires? And unreasonable restraints by the national government on mobility can be upset by the Due Process Clause in the Fifth Amendment . . . . Thus the 'liberty' of all human beings which cannot be taken away without due process of law includes liberty of speech, press, assembly, religion, and also liberty of movement." *Id.*, at 192–193.

This due process approach to the right to unimpeded movement has been endorsed by this Court. In *Kent v. Dulles,* 357 U. S. 116, the Court asserted that "The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment," *id.*, at 125, citing *Crandall v. Nevada, supra,* and *Edwards v. California, supra.* It is true that the holding in that case turned essentially on statutory grounds. However, in *Aptheker v. Secretary of State,* 378 U. S. 500, the Court, applying this constitutional doctrine, struck down a federal statute forbidding members of Communist organizations to obtain passports. Both the majority and dissenting opinions affirmed the principle that the right to travel is an aspect of the liberty guaranteed by the Due Process Clause.

Viewing the right to travel in due process terms, of course, would clearly make it inapplicable to the present case, for due process speaks only to governmental action.

## IV.

This survey of the various bases for grounding the "right to travel" is conclusive only to the extent of showing that there has never been an acknowledged constitutional right to be free from private interference, and that the right in question has traditionally been seen and applied, whatever the constitutional underpinning asserted, only against governmental impediments. The right involved being as nebulous as it is, however, it is necessary to consider it in terms of policy as well as precedent.

As a general proposition it seems to me very dubious that the Constitution was intended to create certain rights of private individuals as against other private individuals. The Constitutional Convention was called to establish a nation, not to reform the common law. Even the Bill of Rights, designed to protect personal liberties, was directed at rights against governmental authority, not other individuals. It is true that there is a very narrow range of rights against individuals which have been read into the Constitution. In *Ex parte Yarbrough,* 110 U. S. 651, the Court held that implicit in the Constitution is the right of citizens to be free of private interference in federal elections. *United States* v. *Classic,* 313 U. S. 299, extended this coverage to primaries. *Logan* v. *United States,* 144 U. S. 263, applied the predecessor of § 241 to a conspiracy to injure someone in the custody of a United States marshal; the case has been read as dealing with a privilege and immunity of citizenship, but it would seem to have depended as well on extrapolations from statutory provisions providing for supervision of prisoners. The Court in *In re Quarles,* 158 U. S. 532, extending *Logan, supra,* declared that there was a right of federal citizenship to inform federal officials of violations of federal law. See also *United*

*States* v. *Cruikshank,* 92 U. S. 542, 552, which announced in dicta a federal right to assemble to petition the Congress for a redress of grievances.

Whatever the validity of these cases on their own terms, they are hardly persuasive authorities for adding to the collection of privileges and immunities the right to be free of private impediments to travel. The cases just discussed are narrow, and are essentially concerned with the vindication of important relationships with the Federal Government—voting in federal elections, involvement in federal law enforcement, communicating with the Federal Government. The present case stands on a considerably different footing.

It is arguable that the same considerations which led the Court on numerous occasions to find a right of free movement against oppressive state action now justify a similar result with respect to private impediments. *Crandall* v. *Nevada, supra,* spoke of the need to travel to the capital, to serve and consult with the offices of government. A basic reason for the formation of this Nation was to facilitate commercial intercourse; intellectual, cultural, scientific, social, and political interests are likewise served by free movement. Surely these interests can be impeded by private vigilantes as well as by state action. Although this argument is not without force, I do not think it is particularly persuasive. There is a difference in power between States and private groups so great that analogies between the two tend to be misleading. If the State obstructs free intercourse of goods, people, or ideas, the bonds of the union are threatened; if a private group effectively stops such communication, there is at most a temporary breakdown of law and order, to be remedied by the exercise of state authority or by appropriate federal legislation.

To decline to find a constitutional right of the nature asserted here does not render the Federal Government

helpless. As to interstate commerce by railroads, federal law already provides remedies for "undue or unreasonable prejudice," 24 Stat. 380, as amended, 49 U. S. C. § 3 (1) (1964 ed.), which has been held to apply to racial discrimination. *Henderson* v. *United States,* 339 U. S. 816. A similar statute applies to motor carriers, 49 Stat. 558, as amended, 49 U. S. C. § 316 (d) (1964 ed.), and to air carriers, 72 Stat. 760, 49 U. S. C. § 1374 (b) (1964 ed.). See *Boynton* v. *Virginia,* 364 U. S. 454; *Fitzgerald* v. *Pan American World Airways,* 229 F. 2d 499. The Civil Rights Act of 1964, 78 Stat. 243, deals with other types of obstructions to interstate commerce. Indeed, under the Court's present holding, it is arguable that any conspiracy to discriminate in public accommodations having the effect of impeding interstate commerce could be reached under § 241, unaided by Title II of the Civil Rights Act of 1964. Because Congress has wide authority to legislate in this area, it seems unnecessary— if prudential grounds are of any relevance, see *Baker* v. *Carr,* 369 U. S. 186, 258–259 (CLARK, J., concurring)— to strain to find a dubious constitutional right.

## V.

If I have succeeded in showing anything in this constitutional exercise, it is that until today there was no federal right to be free from private interference with interstate transit, and very little reason for creating one. Although the Court has ostensibly only "discovered" this private right in the Constitution and then applied § 241 mechanically to punish those who conspire to threaten it, it should be recognized that what the Court has in effect done is to use this all-encompassing criminal statute to fashion federal common-law crimes, forbidden to the federal judiciary since the 1812 decision in *United States* v. *Hudson,* 7 Cranch 32. My Brother DOUGLAS, dissenting in *United States* v. *Classic, supra,*

noted well the dangers of the indiscriminate application of the predecessor of § 241: "It is not enough for us to find in the vague penumbra of a statute some offense about which Congress could have legislated, and then to particularize it as a crime because it is highly offensive." 313 U. S., at 331–332.

I do not gainsay that the immunities and commerce provisions of the Constitution leave the way open for the finding of this "private" constitutional right, since they do not speak solely in terms of governmental action. Nevertheless, I think it wrong to sustain a criminal indictment on such an uncertain ground. To do so subjects § 241 to serious challenge on the score of vagueness and serves in effect to place this Court in the position of making criminal law under the name of constitutional interpretation. It is difficult to subdue misgivings about the potentialities of this decision.

I would sustain this aspect of the indictment only on the premise that it sufficiently alleges state interference with interstate travel, and on no other ground.

Mr. Justice Brennan, with whom The Chief Justice and Mr. Justice Douglas join, concurring in part and dissenting in part.

I join Part I of the Court's opinion. I reach the same result as the Court on that branch of the indictment discussed in Part III of its opinion but for other reasons. See footnote 3, *infra.* And I agree with so much of Part II as construes 18 U. S. C. § 241 (1964 ed.) to encompass conspiracies to injure, oppress, threaten or intimidate citizens in the free exercise or enjoyment of Fourteenth Amendment rights and holds that, as so construed, § 241 is not void for indefiniteness. I do not agree, however, with the remainder of Part II which holds, as I read the opinion, that a conspiracy to interfere with the exercise of the right to equal utilization of

state facilities is not, within the meaning of § 241, a conspiracy to interfere with the exercise of a "right . . . secured . . . by the Constitution" unless discriminatory conduct by state officers is involved in the alleged conspiracy.

### I.

The second numbered paragraph of the indictment charges that the defendants conspired to injure, oppress, threaten, and intimidate Negro citizens in the free exercise and enjoyment of "[t]he right to the equal utilization, without discrimination upon the basis of race, of public facilities . . . owned, operated or managed by or on behalf of the State of Georgia or any subdivision thereof." Appellees contend that as a matter of statutory construction § 241 does not reach such a conspiracy. They argue that a private conspiracy to interfere with the exercise of the right to equal utilization of the state facilities described in that paragraph is not, within the meaning of § 241, a conspiracy to interfere with the exercise of a right "secured" by the Fourteenth Amendment because "there exist no Equal Protection Clause rights against wholly private action."

The Court deals with this contention by seizing upon an allegation in the indictment concerning one of the means employed by the defendants to achieve the object of the conspiracy. The indictment alleges that the object of the conspiracy was to be achieved, in part, "[b]y causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts . . . ." The Court reads this allegation as "broad enough to cover a charge of active connivance by agents of the State in the making of the 'false reports,' or other conduct amounting to official discrimination clearly sufficient to constitute denial of rights protected by the Equal Protection Clause," and the Court holds that this allegation, so construed, is sufficient to "prevent dismissal of this

branch of the indictment." [1] I understand this to mean that, no matter how compelling the proof that private conspirators murdered, assaulted, or intimidated Negroes in order to prevent their use of state facilities, the prosecution under the second numbered paragraph must fail in the absence of proof of active connivance of law enforcement officers with the private conspirators in causing the false arrests.

Hence, while the order dismissing the second numbered paragraph of the indictment is reversed, severe limitations on the prosecution of that branch of the indictment are implicitly imposed. These limitations could only stem from an acceptance of appellees' contention that, because there exist no Equal Protection Clause rights against wholly private action, a conspiracy of private persons to interfere with the right to equal utilization of state facilities described in the second numbered paragraph is not a conspiracy to interfere with a "right . . . secured . . . by the Constitution" within the meaning of § 241. In other words, in the Court's

---

[1] As I read the indictment, the allegation regarding the false arrests relates to all the other paragraphs and not merely, as the Court suggests, to the second numbered paragraph of the indictment. See n. 1 in the Court's opinion. Hence, assuming that, as maintained by the Court, the allegation could be construed to encompass discriminatory conduct by state law enforcement officers, it would be a sufficient basis for preventing the dismissal of each of the other paragraphs of the indictment. The right to be free from discriminatory conduct by law enforcement officers while using privately owned places of public accommodation (paragraph one) or while traveling from State to State (paragraphs three and four), or while doing anything else, is unquestionably secured by the Equal Protection Clause. It would therefore be unnecessary to decide whether the right to travel from State to State is itself a right secured by the Constitution or whether paragraph one is defective either because of the absence of an allegation of a racial discriminatory motive or because of the exclusive remedy provision of the Civil Rights Act of 1964, § 207 (b), 78 Stat. 246, 42 U. S. C. § 2000a–6 (b) (1964 ed.).

view the only right referred to in the second numbered paragraph that is, for purposes of § 241, "secured . . . by the Constitution" is a right to be free—when seeking access to state facilities—from discriminatory conduct by state officers or by persons acting in concert with state officers.[2]

I cannot agree with that construction of § 241. I am of the opinion that a conspiracy to interfere with the right to equal utilization of state facilities described in the second numbered paragraph of the indictment is a conspiracy to interfere with a "right . . . secured . . . by the Constitution" within the meaning of § 241—without regard to whether state officers participated in the alleged conspiracy. I believe that § 241 reaches such a private conspiracy, not because the Fourteenth Amendment of its own force prohibits such a conspiracy, but because § 241, as an exercise of congressional power under § 5 of that Amendment, prohibits *all* conspiracies to interfere with the exercise of a "right . . . secured . . . by the Constitution" and because the right to equal utilization of state facilities is a "right . . . secured . . . by the Constitution" within the meaning of that phrase as used in § 241.[3]

My difference with the Court stems from its construction of the term "secured" as used in § 241 in the phrase a "right . . . secured . . . by the Constitution or laws

---

[2] I see no basis for a reading more consistent with my own view in the isolated statement in the Court's opinion that "the rights under the Equal Protection Clause described by this paragraph [two] of the indictment have been . . . firmly and precisely established by a consistent line of decisions in this Court . . . ."

[3] Similarly, I believe that § 241 reaches a private conspiracy to interfere with the right to travel from State to State. I therefore need not reach the question whether the Constitution of its own force prohibits private interferences with that right; for I construe § 241 to prohibit such interferences, and as so construed I am of the opinion that § 241 is a valid exercise of congressional power.

of the United States." The Court tacitly construes the term "secured" so as to restrict the coverage of § 241 to those rights that are "fully protected" by the Constitution or another federal law. Unless private interferences with the exercise of the right in question are prohibited by the Constitution itself or another federal law, the right cannot, in the Court's view, be deemed "secured . . . by the Constitution or laws of the United States" so as to make § 241 applicable to a private conspiracy to interfere with the exercise of that right. The Court then premises that neither the Fourteenth Amendment nor any other federal law [4] prohibits private interferences with the exercise of the right to equal utilization of state facilities.

In my view, however, a right can be deemed "secured . . . by the Constitution or laws of the United States," within the meaning of § 241, even though only governmental interferences with the exercise of the right are prohibited by the Constitution itself (or another fed-

---

[4] This premise is questionable. Title III of the Civil Rights Act of 1964, 78 Stat. 246, 42 U. S. C. § 2000b (1964 ed.), authorizes the Attorney General on complaint from an individual that he is "being denied equal utilization of any public facility which is owned, operated, or managed by or on behalf of any State or subdivision," to commence a civil action "for such relief as may be appropriate" and against such parties as are "necessary to the grant of effective relief." Arguably this would authorize relief against private parties not acting in concert with state officers. (This title of the Act does not have an exclusive remedy similar to § 207 (b) of Title II, 42 U. S. C. § 2000a–6 (b).)

The Court affirmatively disclaims any intention to deal with Title III of the Civil Rights Act of 1964 in connection with the second numbered paragraph of the indictment. But, as the District Judge observed in his opinion, the Government maintained that the right described in that paragraph was "secured" by the Fourteenth Amendment and, "additionally," by Title III of the Civil Rights Act of 1964. 246 F. Supp., at 484. That position was not effectively abandoned in this Court.

eral law). The term "secured" means "created by, arising under or dependent upon," *Logan* v. *United States,* 144 U. S. 263, 293, rather than "fully protected." A right is "secured . . . by the Constitution" within the meaning of § 241 if it emanates from the Constitution, if it finds its source in the Constitution. Section 241 must thus be viewed, in this context, as an exercise of congressional power to amplify prohibitions of the Constitution addressed, as is invariably the case, to government officers; contrary to the view of the Court, I think we are dealing here with a statute that seeks to implement the Constitution, not with the "bare terms" of the Constitution. Section 241 is not confined to protecting rights against private conspiracies that the Constitution or another federal law also protects against private interferences. No such duplicative function was envisioned in its enactment. See Appendix in *United States* v. *Price, post,* p. 807. Nor has this Court construed § 241 in such a restrictive manner in other contexts. Many of the rights that have been held to be encompassed within § 241 are not additionally the subject of protection of specific federal legislation or of any provision of the Constitution addressed to private individuals. For example, the prohibitions and remedies of § 241 have been declared to apply, without regard to whether the alleged violator was a government officer, to interferences with the right to vote in a federal election, *Ex parte Yarbrough,* 110 U. S. 651, or primary, *United States* v. *Classic,* 313 U. S. 299; the right to discuss public affairs or petition for redress of grievances, *United States* v. *Cruikshank,* 92 U. S. 542, 552, cf. *Hague* v. *CIO,* 307 U. S. 496, 512–513 (opinion of Roberts, J.); *Collins* v. *Hardyman,* 341 U. S. 651, 663 (dissenting opinion); the right to be protected against violence while in the lawful custody of a federal officer, *Logan* v. *United States,* 144 U. S. 263; and the right to inform of violations of

federal law, *In re Quarles and Butler*, 158 U. S. 532. The full import of our decision in *United States* v. *Price, post,* p. 787, at pp. 796–807, regarding § 241 is to treat the rights purportedly arising from the Fourteenth Amendment in parity with those rights just enumerated, arising from other constitutional provisions. The reach of § 241 should not vary with the particular constitutional provision that is the source of the right. For purposes of applying § 241 to a private conspiracy, the standard used to determine whether, for example, the right to discuss public affairs or the right to vote in a federal election is a "right . . . secured . . . by the Constitution" is the very same standard to be used to determine whether the right to equal utilization of state facilities is a "right . . . secured . . . by the Constitution."

For me, the right to use state facilities without discrimination on the basis of race is, within the meaning of § 241, a right created by, arising under and dependent upon the Fourteenth Amendment and hence is a right "secured" by that Amendment. It finds its source in that Amendment. As recognized in *Strauder* v. *West Virginia,* 100 U. S. 303, 310, "The Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect. It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights . . . ." The Fourteenth Amendment commands the State to provide the members of all races with equal access to the public facilities it owns or manages, and the right of a citizen to use those facilities without discrimination on the basis of race is a basic corollary of this command. Cf. *Brewer* v. *Hoxie School District No. 46,* 238 F. 2d 91 (C. A. 8th Cir. 1956). Whatever may be the status of the right to equal utilization of *privately owned facilities,* see generally *Bell* v. *Maryland,* 378 U. S. 226, it must be emphasized that we

are here concerned with the right to equal utilization of *public facilities owned or operated by or on behalf of the State*. To deny the existence of this right or its constitutional stature is to deny the history of the last decade, or to ignore the role of federal power, predicated on the Fourteenth Amendment, in obtaining nondiscriminatory access to such facilities. It is to do violence to the common understanding, an understanding that found expression in Titles III and IV of the Civil Rights Act of 1964, 78 Stat. 246, 42 U. S. C. §§ 2000b, 2000c (1964 ed.), dealing with state facilities. Those provisions reflect the view that the Fourteenth Amendment creates the right to equal utilization of state facilities. Congress did not preface those titles with a provision comparable to that in Title II [5] explicitly creating the right to equal utilization of certain privately owned facilities. Congress rightly assumed that a specific legislative declaration of the right was unnecessary, that the right arose from the Fourteenth Amendment itself.

In reversing the District Court's dismissal of the second numbered paragraph, I would therefore hold that proof at the trial of the conspiracy charged to the defendants in that paragraph will establish a violation of § 241 without regard to whether there is also proof that state law enforcement officers actively connived in causing the arrests of Negroes by means of false reports.

## II.

My view as to the scope of § 241 requires that I reach the question of constitutional power—whether § 241 or legislation indubitably designed to punish entirely pri-

---

[5] "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U. S. C. § 2000a (a) (1964 ed.).

vate conspiracies to interfere with the exercise of Fourteenth Amendment rights constitutes a permissible exercise of the power granted to Congress by § 5 of the Fourteenth Amendment "to enforce, by appropriate legislation, the provisions of" the Amendment.

A majority of the members of the Court [6] expresses the view today that § 5 empowers Congress to enact laws punishing *all* conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not state officers or others acting under the color of state law are implicated in the conspiracy. Although the Fourteenth Amendment itself, according to established doctrine, "speaks to the State or to those acting under the color of its authority," legislation protecting rights created by that Amendment, such as the right to equal utilization of state facilities, need not be confined to punishing conspiracies in which state officers participate. Rather, § 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created by and arising under that Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection. It made that determination in enacting § 241, see the Appendix in *United States* v. *Price, post,* p. 807, and, therefore § 241 is constitutional legislation as applied to reach the private conspiracy alleged in the second numbered paragraph of the indictment.

I acknowledge that some of the decisions of this Court, most notably an aspect of the *Civil Rights Cases,* 109 U. S. 3, 11, have declared that Congress' power under

---

[6] The majority consists of the Justices joining my Brother CLARK's opinion and the Justices joining this opinion. The opinion of MR. JUSTICE STEWART construes § 241 as applied to the second numbered paragraph to require proof of active participation by state officers in the alleged conspiracy and that opinion does not purport to deal with this question.

§ 5 is confined to the adoption of "appropriate legislation for correcting the effects of . . . prohibited State laws and State acts, and thus to render them effectually null, void, and innocuous." I do not accept—and a majority of the Court today rejects—this interpretation of § 5. It reduces the legislative power to enforce the provisions of the Amendment to that of the judiciary;[7] and it attributes a far too limited objective to the Amendment's sponsors.[8] Moreover, the language of § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment are virtually the same, and we recently held in *South Carolina* v. *Katzenbach, ante,* p. 301, at 326, that "[t]he basic test to be applied in a case involving § 2 of the Fifteenth Amendment is the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States." The classic formulation of that test by Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, was there adopted:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end,

---

[7] Congress, not the judiciary, was viewed as the more likely agency to implement fully the guarantees of equality, and thus it could be presumed the primary purpose of the Amendment was to augment the power of Congress, not the judiciary. See James, The Framing of the Fourteenth Amendment 184 (1956); Harris, The Quest for Equality 53–54 (1960); Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L. J. 1353, 1356 (1964).

[8] As the first Mr. Justice Harlan said in dissent in the *Civil Rights Cases,* 109 U. S., at 54: "It was perfectly well known that the great danger to the equal enjoyment by citizens of their rights, as citizens, was to be apprehended not altogether from unfriendly State legislation, but from the hostile action of corporations and individuals in the States. And it is to be presumed that it was intended, by that section [§ 5], to clothe Congress with power and authority to meet that danger." See *United States* v. *Price, post,* p. 787, at 803–806, and Appendix.

which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

It seems to me that this is also the standard that defines the scope of congressional authority under § 5 of the Fourteenth Amendment. Indeed, *South Carolina* v. *Katzenbach* approvingly refers to *Ex parte Virginia,* 100 U. S. 339, 345–346, a case involving the exercise of the congressional power under § 5 of the Fourteenth Amendment, as adopting the *McCulloch* v. *Maryland* formulation for "each of the Civil War Amendments."

Viewed in its proper perspective, § 5 of the Fourteenth Amendment appears as a positive grant of legislative power, authorizing Congress to exercise its discretion in fashioning remedies to achieve civil and political equality for all citizens. No one would deny that Congress could enact legislation directing state officials to provide Negroes with equal access to state schools, parks and other facilities owned or operated by the State. Nor could it be denied that Congress has the power to punish state officers who, in excess of their authority and in violation of state law, conspire to threaten, harass and murder Negroes for attempting to use these facilities.[9] And I can find no principle of federalism nor word of the Constitution that denies Congress power to determine that in order adequately to protect the right to equal utilization of state facilities, it is also appropriate to punish other individuals—not state officers themselves and not acting in concert with state officers—who engage in the same brutal conduct for the same misguided purpose.[10]

---

[9] *United States* v. *Price, post,* p. 787. See *Screws* v. *United States,* 325 U. S. 91; *Williams* v. *United States,* 341 U. S. 97; *Monroe* v. *Pape,* 365 U. S. 167.

[10] Cf. *Atlanta Motel* v. *United States,* 379 U. S. 241, 258, applying the settled principle expressed in *United States* v. *Darby,* 312 U. S. 100, 118, that the power of Congress over interstate commerce "ex-

## III.

Section 241 is certainly not model legislation for punishing private conspiracies to interfere with the exercise of the right of equal utilization of state facilities. It deals in only general language "with Federal rights and with all Federal rights" and protects them "in the lump," *United States* v. *Mosley,* 238 U. S. 383, 387; it protects in most general terms "any right or privilege secured . . . by the Constitution or laws of the United States." Congress has left it to the courts to mark the bounds of those words, to determine on a case-by-case basis whether the right purportedly threatened is a federal right. That determination may occur after the conduct charged has taken place or it may not have been anticipated in prior decisions; "a penumbra of rights may be involved, which none can know until decision has been made and infraction may occur before it is had." [11] Reliance on such wording plainly brings § 241 close to the danger line of being void for vagueness.

But, as the Court holds, a stringent scienter requirement saves § 241 from condemnation as a criminal statute failing to provide adequate notice of the proscribed conduct.[12] The gravamen of the offense is conspiracy, and therefore, like a statute making certain conduct criminal

tends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end . . . ."

[11] Mr. Justice Rutledge in *Screws* v. *United States,* 325 U. S., at 130.

[12] *Ante,* pp. 753–754. See generally, *Boyce Motor Lines, Inc.* v. *United States,* 342 U. S. 337, 342; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 412–413; *United States* v. *Ragen,* 314 U. S. 513, 524; *Gorin* v. *United States,* 312 U. S. 19, 27–28; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 501–503; *Omaechevarria* v. *Idaho,* 246 U. S. 343, 348.

only if it is done "willfully," § 241 requires proof of a specific intent for conviction. We have construed § 241 to require proof that the persons charged conspired to act in defiance, or in reckless disregard, of an announced rule making the federal right specific and definite. *United States* v. *Williams,* 341 U. S. 70, 93–95 (opinion of DOUGLAS, J.); *Screws* v. *United States,* 325 U. S. 91, 101–107 (opinion of DOUGLAS, J.) (involving the predecessor to 18 U. S. C. § 242). Since this case reaches us on the pleadings, there is no occasion to decide now whether the Government will be able on trial to sustain the burden of proving the requisite specific intent *vis-à-vis* the right to travel freely from State to State or the right to equal utilization of state facilities. Compare *James* v. *United States,* 366 U. S. 213, 221–222 (opinion of WARREN, C. J.). In any event, we may well agree that the necessity to discharge that burden can imperil the effectiveness of § 241 where, as is often the case, the pertinent constitutional right must be implied from a grant of congressional power or a prohibition upon the exercise of governmental power. But since the limitation on the statute's effectiveness derives from Congress' failure to define—with any measure of specificity—the rights encompassed, the remedy is for Congress to write a law without this defect. To paraphrase my Brother DOUGLAS' observation in *Screws* v. *United States,* 325 U. S., at 105, addressed to a companion statute with the same shortcoming, if Congress desires to give the statute more definite scope, it may find ways of doing so.