K. Leroy IRVIS, Plaintiff,

v.

William Z. SCOTT, Chairman, Edwin Winner, Member, and George R. Bortz, Member, Liquor Control Board, Commonwealth of Pennsylvania

and

Moose Lodge No. 107, Harrisburg, Pennsylvania, Defendants.

Civ. A. No. 69–107.

United States District Court, M. D. Pennsylvania.

Aug. 26, 1970.

Harry J. Rubin, Liverant, Senft & Cohen, York, Pa., for plaintiff.

Thomas J. Shannon, Asst. Atty. Gen., Harrisburg, Pa., for defendant, Pennsylvania, Liquor Control Board.

Thomas D. Caldwell, Jr., Harrisburg, Pa., for Moose Lodge 107.

Robert E. Woodside, Woodside, Woodside & Zwally, Harrisburg, Pa., Clarence J. Ruddy, Aurora, Ill., amicus curiae.

Before FREEDMAN, Circuit Judge, SHERIDAN, Chief District Judge, and NEALON, District Judge.

OPINION

FREEDMAN, Circuit Judge.

The facts in this case are undisputed. They are drawn from the pleadings and stipulations of the parties.

Defendant Moose Lodge No. 107 is a non-profit corporation organized under the laws of Pennsylvania. It is a subordinate lodge chartered by The Supreme Lodge of the World, Loyal Order of Moose, a non-profit corporation organized under the laws of Indiana, which we permitted to intervene and argue as amicus curiae. The local Lodge conducts all its activities in Harrisburg in a building which it owns. It has never been the recipient of public funds. It is the holder of a club liquor license issued by the defendant Liquor Control Board of the Commonwealth of Pennsylvania, pursuant to the provisions of the Pennsylvania Liquor Code, Act of April 12, 1951, P.L. 90, as amended.[1]

Under its charter from the Supreme Lodge the local Lodge is bound by the constitution and general by-laws of the

---

1. 47 Purdon's Pa.Stat.Annot. § 1–101 et seq.

Supreme Lodge.[2] The Constitution of the Supreme Lodge provides: "The membership of the lodges shall be composed of male persons of the Caucasian or White race above the age of twenty-one years, and not married to someone of other than the Caucasian or White race, who are of good moral character, physically and mentally normal, who shall profess a belief in a Supreme Being. * * * "[3] The lodges accordingly maintain a policy and practice of restricting membership to the Caucasian race and permitting members to bring only Caucasian guests on lodge premises, particularly to the dining room and bar.[4]

On Sunday, December 29, 1968, a Caucasian member in good standing brought plaintiff, a Negro, to the Lodge's dining room and bar as his guest and requested service of food and beverages. The Lodge through its employees refused service to plaintiff solely because he is a Negro.

Plaintiff complained of the refusal of service to the Pennsylvania Human Relations Commission, which upheld his complaint. The Commission held that the dining room was a "place of public accommodation," within the definition of the Pennsylvania Human Relations Act of February 28, 1961, P.L. 47,[5] and that the local Lodge had been guilty of discrimination against defendant. On appeal by the local Lodge the Court of Common Pleas of Dauphin County reversed the Commission and held that the dining room was not a place of public accommodation within the meaning of the Act.[6]

In the meanwhile plaintiff brought this action in the District Court for the Middle District of Pennsylvania, and this three-judge court was constituted under 28 U.S.C. § 2281 to determine whether the issuance or renewal by the Pennsylvania Liquor Control Board under the Pennsylvania Liquor Code of a club liquor license to the local Lodge despite its discrimination against Negroes violates the Equal Protection Clause of the Fourteenth Amendment.

Racial discrimination is undisputed in this case. It was not only practiced against plaintiff by the local Lodge but is required by the constitution of the Supreme Lodge.

2. The objects and purposes of the local Lodge are set forth in the Constitution of the Supreme Lodge as follows:

"The objects and purposes of said fraternal and charitable lodges, chapters, and other units are to unite in the bonds of fraternity, benevolence, and charity all acceptable white persons of good character; to educate and improve their members and the families of their members, socially, morally, and intellectually; to assist their members and their families in time of need; to aid and assist the aged members of the said lodges, and their wives; to encourage and educate their members in patriotism and obedience to the laws of the country in which such lodges or other units exist, and to encourage tolerance of every kind; to render particular service to orphaned or dependent children by the operation of one or more vocational, educational institutions of the type and character of the institution called 'Mooseheart,' and located at Mooseheart, in the State of Illinois; to serve aged members and their wives in a special and unusual way at one or more institutions of the character and type of the place called 'Moosehaven,' located at Orange Park, in the State of Florida; to create and maintain foundations, endowment funds, or trust funds, for the purpose of aiding and assisting in carrying on the charitable and philanthropic enterprises heretofore mentioned; provided, however, that the corporation may act as trustee in the administration of such trust funds, with authority to use the interest therefrom and, in cases of emergency, the principal as well, for the perpetuation of Mooseheart and Moosehaven or either of them."

3. Section 71–1.

4. Section 92.2 of the Constitution of the Supreme Lodge permits members to invite non-members, apparently without limitation, to social clubs maintained by a lodge. Under § 92.6 only a member may make any purchase.

5. 43 Purdon's Pa.Stat.Annot. § 951 et seq.

6. Pennsylvania Human Relations Commission v. The Loyal Order of Moose, Lodge No. 107 (C.P. Dauphin County, March 6, 1970).

The question in the case, therefore, is focused on whether the admitted discrimination by the local Lodge in refusing to serve plaintiff a drink of liquor because of his race bore the attributes of state action and so falls within the prohibition of the Fourteenth Amendment against the denial by a state of the equal protection of the laws.

The boundaries which define what is state action are not always clear.[7] This case presents a situation which is one of first impression. It comes to us surrounded by a mass of decisions which can serve as guides, although they do not authoritatively direct our conclusion.[8]

We believe the decisive factor is the uniqueness and the all-pervasiveness of the regulation by the Commonwealth of Pennsylvania of the dispensing of liquor under licenses granted by the state. The regulation inherent in the grant of a state liquor license is so different in nature and extent from the ordinary licenses issued by the state that it is different in quality.

It had always been held in Pennsylvania, even prior to the Eighteenth Amendment, that the exercise of the power to grant licenses for the sale of intoxicating liquor was an exercise of the highest governmental power, one in which the state had the fullest freedom inhering in the police power of the sovereign.[9] With the Eighteenth Amendment which went into effect in 1919 the right to deal in intoxicating liquor was extinguished. The era of Prohibition ended with the adoption in 1933 of the Twenty-first Amendment, which has left to each state the absolute power to prohibit the sale, possession or use of intoxicating liquor, and in general to deal otherwise with it as it sees fit.[10]

7. "Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' Kotch v. Board of River Pilot Com'rs, 330 U.S. 552, 556, 67 S.Ct. 910, 912, 91 L.Ed. 1093. Only by sifting facts and weighing circumstances could the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed. 2d 45 (1961).

8. A few of the leading discussions of the subject of state action are Developments in the Law: Equal Protection, 82 Harv. L.Rev. 1065 (1969); Black, Forward: State Action, Equal Protection, and California's Proposition 14," 81 Harv.L.Rev. 69 (1968); Paulsen, The Sit-In Cases of 1964: "But Answer Came There None," 1964 Sup.Ct.Rev. 137 (1964); Henkin, Shelley v. Kraemer: Notes for a Revised Opinion, 110 U.Pa.L.Rev. 473 (1962); Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083 (1960).

9. Tahiti Bar Inc. Liquor License Case, 395 Pa. 355, 150 A.2d 112, appeal dismissed, 361 U.S. 85, 80 S.Ct. 159, 4 L.Ed.2d 116 (1959); Cavanaugh v. Gelder, 364 Pa. 361, 72 A.2d 85 (1950); Spankard's Liquor License Case, 138 Pa.Super. 251, 10 A.2d 899 (1940); Commonwealth v. One Dodge Motor Truck, 123 Pa.Super. 311, 187 A. 461 (1936). See also Goesaert v. Cleary, 335 U.S. 464, 465, 69 S.Ct. 198, 93 L.Ed. 163 (1948) ("The regulation of the liquor traffic is one of the oldest and most untrammeled of legislative powers. * * *"); Crane v. Campbell, 245 U.S. 304, 308, 38 S.Ct. 98, 62 L.Ed. 304 (1917); Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) and License Cases, 46 U.S. (5 How.) 504, 12 L.Ed. 256 (1847).

10. See, e. g., Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 42, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 330, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Ziffrin, Inc. v. Reeves, 308 U.S. 132, 138, 60 S.Ct. 163, 84 L.Ed. 128 (1939); State Board of Equalization of Calif. v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936). See generally, Note, The Evolving Scope of State Power Under the Twenty-first Amendment, 19 Rutgers L.Rev. 759 (1965).

Pennsylvania has exercised this power with the fullest measure of state authority. Under the Pennsylvania plan the state monopolizes the sale of liquor through its so-called state stores, operated by the estate. Resale of liquor is permitted by hotels, restaurants and private clubs, which must obtain licenses from the Liquor Control Board, authorizing them "to purchase liquor from a Pennsylvania Liquor Store [at a discount] and keep on the premises such liquor and, subject to the provisions of this Act and the regulations made thereunder to sell the same and also malt or brewed beverages to guests, patrons or members for consumption on the hotel, restaurant or club premises." [11]

The issuance or refusal of a license to a club is in the discretion of the Liquor Control Board.[12] In order to secure one of the limited number of licenses which are available in each municipality [13] an applicant must comply with extensive requirements, which in general are applicable to commercial and club licenses equally. The applicant must make such physical alterations in his premises as the Board may require and, if a club, must file a list of the names and addresses of its members and employees, together with such other information as the Board may require.[14] He must conform his overall financial arrangements to the statute's exacting requirements [15]

and keep extensive records.[16] He may not permit "persons of ill repute" to frequent his premises [17] nor allow thereon at any time any "lewd, immoral or improper entertainment." [18] He must grant the Board and its agents the right to inspect the licensed premises at any time when patrons, guests or members are present.[19] It is only on compliance with these and numerous other requirements and if the Board is satisfied that the applicant is "a person of good repute" and that the license will not be "detrimental to the welfare, health, peace and morals of the inhabitants of the neighborhood," that the license may issue.[20]

Once a license has been issued the licensee must comply with many detailed requirements or risk its suspension or revocation. He must in any event have it renewed periodically. Liquor licenses have been employed in Pennsylvania to regulate a wide variety of moral conduct, such as the presence and activities of homosexuals,[21] performance by a topless dancer,[22] lewd dancing,[23] swearing,[24] being noisy or disorderly.[25] So broad is the state's power that the courts of Pennsylvania have upheld its restriction of freedom of expression of a licensee on the ground that in doing so it merely exercises its plenary power to attach conditions to the privilege of dis-

---

11. 47 Purdon's Pa.Stat.Annot. § 4–401(a).

12. 47 Purdon's Pa.Stat.Annot. § 4–404.

13. See 47 Purdon's Pa.Stat.Annot., § 4–461, as amended, and § 4.472.1. When the quota for commercial licenses is reached in a municipality, no new club license can be issued there even if a club license already granted is eliminated.

14. 47 Purdon's Pa.Stat.Annot. § 4–403. See also § 1–102, "club."

15. See, e. g., 47 Purdon's Pa.Stat.Annot. § 4–411 and § 4–493.

16. See, e. g., 47 Purdon's Pa.Stat.Annot. § 4–493(12).

17. 47 Purdon's Pa.Stat.Annot. § 4–493 (14).

18. 47 Purdon's Pa.Stat.Annot. § 4–493(10).

19. 47 Purdon's Pa.Stat.Annot. § 4–493 (21).

20. 47 Purdon's Pa.Stat.Annot. § 4–404.

21. Freedman, Liquor License Case, 211 Pa. Super. 132, 235 A.2d 625 (1967).

22. Scarcia Appeal, 46 Pa.Dist. & Co.2d 742 (C.P. Lehigh Co. 1968).

23. Golden Bar, Inc., Liquor License Case No. 2, 193 Pa.Super. 404, 165 A.2d 287 (1960).

24. Reiter Liquor License Case, 173 Pa. Super. 552, 554, 98 A.2d 465, 467 (1953).

25. Petty Liquor License Case, 216 Pa. Super. 55, 258 A.2d 874 (1969) and cases there cited.

pensing liquor which a licensee holds at the sufferance of the state.[26]

These are but some of the many reported illustrations of the use which the state has made of its unrestricted power to regulate and even to deny the right to sell, transport or possess intoxicating liquor. It would be difficult to find a more pervasive interaction of state authority with personal conduct. The holder of a liquor license from the Commonwealth of Pennsylvania therefore is not like other licensees who conduct their enterprises at arms-length from the state, even though they may have been required to comply with certain conditions, such as zoning or building requirements, in order to obtain or continue to enjoy the license which authorizes them to engage in their business. The state's concern in such cases is minimal and once the conditions it has exacted are met the customary operations of the enterprise are free from further encroachment. Here by contrast beyond the act of licensing is the continuing and pervasive regulation of the licensees by the state to an unparalleled extent. The unique power which the state enjoys in this area, which has put it in the business of operating state liquor stores and in the role of licensing clubs, has been exercised in a manner which reaches intimately and deeply into the operation of the licensees.

In addition to this, the regulations of the Liquor Control Board adopted pursuant to the statute affirmatively require that "every club licensee shall adhere to all the provisions of its constitution and by-laws."[27] As applied to the

present case this regulation requires the local Lodge to adhere to the constitution of the Supreme Lodge[28] and thus to exclude non-Caucasians from membership in its licensed club. The state therefore has been far from neutral. It has declared that the local Lodge must adhere to the discriminatory provision under penalty of loss of its license. It would be difficult in any event to consider the state neutral in an area which is so permeated with state regulation and control, but any vestige of neutrality disappears when the state's regulation specifically exacts compliance by the licensee with an approved provision for discrimination, especially where the exaction holds the threat of loss of the license.

However it may deal with its licensees in exercising its great and untrammeled power over liquor traffic, the state may not discriminate against others or disregard the operation of the Equal Protection Clause of the Fourteenth Amendment as it affects personal rights.[29] Here the state has used its great power to license the liquor traffic in a manner which has no relation to the traffic in liquor itself but instead permits it to be exploited in the pursuit of a discriminatory practice. Here then are fully applicable the words of the Supreme Court in Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961), where discrimination by a coffee shop lessee in the municipal parking authority's garage building was held to be state action:

"[I]n its lease with Eagle the Authority could have affirmatively re-

---

26. Tahiti Bar, Inc. Liquor License Case, 395 Pa. 355, 360–362, 150 A.2d 112, 115–116, appeal dismissed 361 U.S. 85, 80 S. Ct. 159, 4 L.Ed.2d 116 (1959).

27. Regulations, § 113.09.

28. As stipulated by the parties, Local Lodge No. 107 has no constitution or by-laws other than those of the Supreme Lodge, by which the local lodge is expressly governed under its charter.

29. Goesaert v. Cleary, 335 U.S. 464, 466, 69 S.Ct. 198, 93 L.Ed. 163 (1948). See,

e. g., Parks v. Allen, 409 F.2d 210 (5 Cir. 1969) ; Atlanta Bowling Center, Inc. v. Allen, 389 F.2d 713 (5 Cir. 1968) ; Lewis v. City of Grand Rapids, 356 F.2d 276 (6 Cir. 1966) ; Seidenberg v. McSorleys' Old Ale House, Inc., 317 F.Supp. 593 (S.D.N.Y.1970). See generally, Provisions of Statute Regarding Personal Qualifications Necessary to Entitle One to License for Sale of Intoxicating Liquor, As Denial of Equal Protection of Laws, 145 A.L.R. 509 (1943).

quired Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be. * * * By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." [30]

As in *Burton* the state has "insinuated itself into a position of interdependence" with its club licensees, and as in Shelley, v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), it has undertaken to enforce the privately promulgated constitutional provisions of the club establishing discrimination.

■ There is no question here of interference with the right of members of the Moose Lodge to associate among themselves in harmony with their private predilections. The state, however, may not confer upon them in doing so the authority which it enjoys under its police power to engage in the sale or distribution of intoxicating liquors, under a grant from the state which is conditioned in this case on the club's adherence to the requirement of its constitution and customs that it must practice discrimination and refuse membership or service because of race.

Nothing in what we here say implies a judgment on private clubs which limit participation to those of a shared religious affiliation or a mutual heritage in national origin. Such cases are not the same as the present one where discrimination is practiced solely on racial grounds and therefore collides head on against the "clear and central purpose of the Fourteenth Amendment * * * to eliminate all official state sources of invidious racial discrimination in the States." Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); and cases there cited.

■ We therefore hold that the club license granted by the Liquor Control Board of the Commonwealth of Pennsylvania to the Moose Lodge No. 107 is invalid because it is in violation of the

---

30. See Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. * * * That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."). See the discussion of *Burton, Evans* and related decisions in Reitman v. Mulkey, 387 U.S. 369, 378–381, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) and in United States v. Guest, 383 U.S. 745, 755–756, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239 (1966) "In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." See also, e. g., Turner v. City of Memphis, 369 U.S. 350, 353, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962); Pennsylvania v. Brown, 392 F.2d 120 (3 Cir.), cert. denied 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4 Cir. 1966); Wimbish v. Pinellas County, Florida, 342 F.2d 804 (5 Cir. 1965); Smith v. Holiday Inns of America, Inc., 336 F.2d 630 (6 Cir. 1964); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir. 1963).

See generally Karst & Horowitz, Reitman v. Mulkey: A Telophase of Substantive Equal Protection, 1967 Sup.Ct.Rev. 39, 55–79 (1967); Peters, Civil Rights and State Non-Action, 34 Notre Dame Lawyer 303 (1959).

Equal Protection Clause of the Fourteenth Amendment of the federal Constitution.

An appropriate form of decree may be submitted.