## Regulations of Project 500 Facilities

CREAMER, Attorney General, January 13, 1972.—

You have asked me to review an opinion of John P. Fernsler, former Deputy Attorney General, transmitted in a memorandum, dated December 17, 1968. I have done so and conclude that it is in error and must be overruled.

That memorandum dealt with the "authority of the Department of Community Affairs to prescribe to municipalities controls over who may be admitted to recreational facilities and what fees may be charged for use of such facilities," where such facilities have been developed with the financial aid of the Commonwealth pursuant to the Land and Water Conservation and Reclamation Act of January 19, 1968, P. L. (1967) 996, sec. 1, 32 PS §5101 et seq. ("Project 500" Act). The Project 500 Act, inter alia, provides assistance to local governments through the Department of Community Affairs in the form of grants-in-aid of up to 50 percent of the cost of land acquisition and development of county and municipal park and recreation lands.

The opinion of December 17, 1968, concluded that the prescription of such controls by Community Affairs was, *in all cases*, unlawful. We now conclude that, in certain circumstances, the imposition of such controls is lawful and, moreover, certain controls are absolutely required by the laws and Constitution of this Commonwealth and of the United States. While it would be impossible to anticipate in advance all the issues that might be posed concerning regulation of access to and use of the above facilities, the following principles are offered as a guide to the Department of Community Affairs.*

---

* If and when regulations are drafted by the Department of Community Affairs to govern Project 500 grants, of course, they will be reviewed in light of these principles by this department in accordance with section 205 of the Commonwealth Documents Law of July 31, 1968, 45 PS §1205.

*I. The legislature has given the Department of Community Affairs the statutory authority to regulate concerning access and use of Project 500 facilities.*

It is perfectly clear that the legislature did not intend the Department of Community Affairs to be simply a "pass-through" agency for the disbursement of Project 500 funds. In the first place, the act establishing the Department of Community Affairs provided, inter alia, that the department should "coordinate and wherever provided by law supervise or administer the various programs of State and Federal assistance and grants, including but not limited to housing, redevelopment, urban renewal, urban planning assistance, Project 70, . . . ": Act of February 1, 1966, P. L. (1965) 1849, sec. 7(h), 71 PS §670.101. In addition, subsection (1) of that same section provides that "[S]ubject to the limitations of this Act and of law, the Secretary of Community Affairs shall, from time to time, establish rules and regulations to better carry this Act into effect."

It is true that at the time this enabling act was passed, the Project 500 amendment had not yet become law, but the legislature made no effort to remove Project 500 from the general statutory authority of the Secretary of Community Affairs. On the contrary, the relevant Project 500 programs were specifically given to the Department of Community Affairs to administer. In addition, Project 500 reflects the same policy considerations and goals as Project 70, a program specifically mentioned in the enabling act. It is obvious, therefore, that Project 500 comes within the department's power to "coordinate . . . supervise . . . administer . . . " and within the department's rule-making and regulatory power.

In the second place, section 16 of the Project 500 Act requires that "development projects shall be submitted to the Department of Community Affairs by the polit-

ical subdivision in an application which contains *information as may be required by the Department of Community Affairs"*: 32 PS §5116(b) (IV). (Italics supplied.) It is on the basis of such an application, of course, that a particular project will be approved or disapproved. While no one would suggest that the department may arbitrarily require all kinds of irrelevant information, certainly the department may *reasonably* require any information that will help it determine not only if the project fits within the four corners of the Project 500 Act, but also if the proposed project will be in conformity with other relevant State and Federal law. Indeed, the department would be failing in its statutory responsibility, if it did not so inquire.

Finally, and of equal importance, in section III of this memorandum it is concluded that, under certain circumstances, the Department of Community Affairs would be acting unconstitutionally if it attempted to disburse funds as a "pass-through" agency. Since any legislation must be construed to be constitutional, if such construction does not do violence to the essential meaning and purpose of the act, and since the construction we give the Project 500 Act does no such violence, then we must conclude that the legislature did not intend to make the Department of Community Affairs a "pass-through" agency, but did intend to give the department reasonable discretion to inquire as to whether any proposed Project 500 project will violate State or Federal law and to make whatever regulations might be reasonably necessary to assure that such projects do not do so.

Without in any way intending to limit the generality of the foregoing, the department must be reasonably assured that any municipality applying for Project 500

funds will operate any proposed facility in conformity with:

(a) The Human Relations Act (Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, as amended, 43 PS §951) et seq., which provides, inter alia, in 43 PS §955(i), that it shall be an unlawful discriminatory practice

"For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any place of public accommodation, resort or amusement to

"(1) Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, *either directly or indirectly*, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, resort or amusement." (Italics supplied.)

It is quite clear that any proposed control over recreational facilities or proposed admission fees may "directly or indirectly" violate the Human Relations Act. For that reason, it would certainly be proper, in many cases even required, for the Department of Community Affairs to scrutinize closely admissions and fee policies of municipalities to Project 500 facilities.

(b) The Civil Rights Act of 1964, 42 USC §2000a, et seq., P. L. 88-352, which provides, inter alia, in 42 USC §2000a:

"(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serve the public is a place of public accommodation

within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action . . ."

Recreational facilities are public accommodations within the meaning of the act. See, e.g., Daniel et al. v. Paul, 395 U. S. 298 (1969). Furthermore, most, if not all, recreational facilities contemplated under Project 500 will both "affect commerce," (see, e.g., Daniel v. Paul, supra, and Scott v. Young, 307 F. Supp. 1005 (D. C. Va., 1969)), and most certainly will be supported by State action, since the municipality will own, operate and maintain the facility. Under these circumstances, it once again becomes incumbent upon the Department of Community Affairs to assure itself that State funds will not be provided for projects that violate Federal law.

(c) *Constitutional Prohibitions:* Section III of this memorandum will deal with the question of whether the act of approving and funding a Project 500 application may be unconstitutional, if such a project is then operated in such a way as to violate the Equal Protection Clause of the United States Constitution. That section will deal with the cases on the subject and determine that, under certain circumstances, admission restrictions or admission fee requirements do violate the Equal Protection Clause. That being so, regardless of whether the act of funding such a project by the Department of Community Affairs might be found to be unconstitutional (we conclude that it very well may), the Department of Community Affairs is under a *statutory* duty not to disburse funds that will be used in an unconstitutional manner and to take whatever regulatory steps necessary in order to be reasonably certain that no project receiving funds will unconstitutionally restrict admission to facilities.

Since, as pointed out below, it was not the intention

of the legislature to make the Departmnet of Community Affairs a "pass-through" agency in disbursing Project 500 funds, but to be sure that such funds not be used in violation of State or Federal law, it surely was the legislature's intention that such funds not be used in violation of the Constitution.

*II. The Department of Community Affairs must follow the Governor's Directive No. 21, September 27, 1971, insofar as it applies to Project 500 facilities, by regulating concerning access and use of such facilities.*

On September 27, 1971, the Governor directed the heads of all administrative departments, inter alia, to:

". . . insure that recipients of State grants do not discriminate . . .

"3. Undertake a review of program services, licensing policies, and .contract compliance to determine what new organizational arrangements, policies and operational plans are needed to combat intentional or unintentional discriminatory practices. We must ask the question, 'Are any of our present regulations or procedures causing us to fail to serve all segments of one public properly?' "

We have already determined that there is nothing in the Project 500 Act that would prevent the Department of Community Affairs from taking whatever steps are reasonably necessary to assure that State funds are not distributed to projects violating the Governor's directive. There is, therefore, a duty to take such action forthwith in order to implement the above directives of the chief executive officer of the Commonwealth.

*III. The Department of Community Affairs is under a constitutional duty not to provide Project 500 funds to municipalities which will proceed to administer the facility in an unconstitutional manner. To prevent such a result, the department must, in the exercise of*

*reasonable discretion, scrutinize Project 500 applications and promulgate appropriate regulations relating thereto.*

Mr. Fernsler's memorandum of December 17, 1968, must also be overruled insofar as it implies not only that the Department of Community Affairs is powerless to regulate regarding municipal controls on admission and fees for Project 500 facilities but also that such municipal controls or fees are likely to be constitutional because "if any state of facts can reasonably be conceived that would sustain [them], there is a presumption of the existence of that state of facts, and the burden of showing arbitrary and unreasonable action rests upon the one who assails the classification."

While it is not necessary, once again, to anticipate every possible factual situation and determine the likely constitutional result, it is necessary to point out at this time that the above passage is a very superficial and misleading statement of the test to be applied when a classification imposed by a municipality is challenged as being violative of the Equal Protection Clause of the Fourteenth Amendment. In that regard the Department of Community Affairs should consider the following:

(a) *Classifications based on Race:* The text suggested in the December 17, 1968, memorandum is incorrect where a classification, either *directly or indirectly,* has the effect of substantially excluding people because of their race, lineage, or alienage from Project 500 facilities. A racial classification has been termed "suspect" by the Supreme Court of the United States. See, e.g., McLaughlin et al. v. Florida, 379 U. S. 184, 191-2 (1964). When a classification is "suspect," a "very heavy burden of justification" may be demanded of a state which draws such a distinction: Loving et ux. v.

Virginia, 388 U. S. 1, 9 (1967). As pointed out in an exhaustive law review article on the subject:

"In subjecting these classifications 'to the most rigid scrutiny.' [Korematsu v. U. S., 323 U. S. 214 (1944)] the courts have required that the classifications bear more than a merely rational connection with a legitimate public purpose. Indeed, over the past seventy years, a number of Justices have advanced the view that the fourteenth amendment prohibits the states from distinguishing between members of different races in *any* state action, regardless of the circumstances or purpose": Developments in the Law—Equal Protection, 82 Harvard Law Review 1065, 1088 (1969). (Italics supplied.)

In addition, it must be emphasized that classifications, not openly racial, may be subjected to the same close scrutiny if their substantial *result* is racial exclusion or discrimination: Hawkins et al. v. Town of Shaw, Mississippi et al., 437 F. 2d 1286 (1971), and cases cited therein.

(b) *Classifications based upon Wealth:* The text of the December 17, 1968, memorandum also is misleading insofar as it relates to classifications based on the payment of a fee, i.e., classifications based on wealth. While Supreme Court decisions dealing with the payment of such fees up to now have dealt with what have been described as "fundamental interests" such as voting and rights with respect to criminal procedure, (see, e.g., Harper et al. v. Virginia Board of Elections et al., 383 U. S. 663 (1966); Griffin et al., v. Illinois, 351 U. S. 12 (1956)), nevertheless, the Supreme Court has now explicitly stated that classification based on wealth is "highly suspect and thereby demand[s] a more exacting judicial scrutiny."

(c) *Constitutional Interests:* Finally, the text sug-

gested by the December 17, 1968, memorandum is not accurate insofar as any classification imposed by a municipality would penalize the exercise of a constitutional right, e.g., freedom of speech. Such a classification will be struck down as unconstitutional "unless shown to be necessary to promote a *compelling* governmental interest . . ."; Shapiro v. Thompson, 394 U. S. 618, 634 (1969).

There can be no other conclusion, therefore, other than that municipal admission restrictions or fees may very well raise constitutional questions of the highest gravity. That conclusion not only necessitates appropriate scrutiny by the Department of Community Affairs under its statutory authority outlined in the previous section, but also requires the department to consider whether the *funding* of a project that will be unconstitutionally administered by a Pennsylvania municipality is itself an unconstitutional State act.

There have been cases where the courts have found that such funding, especially where the amount is very substantial, as it is here 50 percent is enough, regardless of the *private* character of the recipient, to constitute state action: Kerr et al. v. Enoch Pratt Free Library et al., 149 F. 2d 212 (4th Cir.), cert. den., 326 U. S. 721 (1945); Griffin et al. v. County School Board et al., 377 U. S. 218 (1964); Irvis v. Scott et al., 318 F. Supp. 1246 (M.D. Pa., 1970). Here, the recipient is not even a private one, but a municipality created by the State and, for purposes of the Fourteenth Amendment, the state itself. Moreover, when one considers the close connection between the Department of Community Affairs and the municipalities in the form of administering and supervising Project 500 grants (as the Department of Community Affairs is bound to do under the enabling legislation), the conclusion is inescapable that the Department of Community Affairs is acting

unconstitutionally in funding a project that will, in operation, violate the Constitution. Of special significance on this point is the case of Ethridge et al. v. Rhodes et al., 268 F. Supp. 83 (S.D. Ohio, 1967), where the Governor of a State was enjoined from disbursing funds and entering into contracts for State construction projects when the private contractors and labor unions were known to have been discriminating in their hiring practices. See also Burton v. Wilmington Parking Authority et al., 365 U.S. 715 (1961); Cooper et al. v. Aaron et al., 358 U.S. 1 (1958); McQueen et al. v. Druker et al., 438 F. 2d 781 (1st Cir. 1971); Derrington et al. v. Plummer et al., 204 F. 2d 922 (5th Cir. 1956).

## CONCLUSION

The conclusion is inescapable, therefore, that the Department of Community Affairs has both a statutory and constitutional duty to closely examine any proposed admission restrictions or fees for future Project 500 projects and to use its reasonable discretion in promulgating regulations relating thereto.