Dear Secretary Howard,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
1. Can the movement of people be restricted during an outbreakof the foot and mouth animal disease?
 2. If so, what entity has the authority to do so?
 I. Foot And Mouth Disease
¶ 1 The Department of Agriculture ("ODA") has reported to this office that the foot and mouth disease ("FMD") is a highly contagious animal disease which is believed to infect 100% of all cloven-hoofed animals that come into contact with the virus. Memorandum from Janet M. Stewart, Legal Services, Department of Agriculture, to Gretchen Zumwalt Smith, Assistant Attorney General of the State of Oklahoma (July 20, 2001) (on file with the Office of Attorney General). The ODA further reports that "[a]ccording to a January 1, 2001 estimate released by the Oklahoma Agricultural Statistics Service, there are almost 7,500,000 cattle, sheep, and swine alone that would be open to exposure in this State. This estimated animal population does not even consider the thousands of goats, antelope, feral pigs, deer, elk, llamas, and other exotic livestock residing in Oklahoma's farms, zoos, and natural habitat that are known to be highly susceptible to the disease. The detection of FMD in any one of these animals would automatically trigger a myriad of procedures such as blood tests, destruction and disposal of infected animals, movement and trade restrictions on animal products, as well as a multitude of other events, too numerous to mention, that would naturally take place as a result."Id. at 2.
¶ 2 The ODA also reports that, while humans are not generally susceptible to FMD, the disease can be spread "through the air and on humans, animals, vehicles, and equipment." Id. at 5. Your first question asks, in the event of a FMD outbreak, can the movement of people be restricted?
 II. ODA's Authority Over Animal Quarantines
¶ 3 The Oklahoma Constitution, Article VI, § 31, provides that the Board of Agriculture "shall have jurisdiction over all matters affecting animal industry and animal quarantine regulation." Additionally, the Board of Agriculture is statutorily authorized to issue quarantine regulations. 2 O.S.Supp. 2000, § 2-4[2-2-4](A)(7-8). Also related to the control of animal disease, the State Veterinarian has the following powers:
 A. The State Veterinarian may determine that any livestock is infected with or has been exposed to any disease posing a threat to the livestock population of the state.
 B. The State Veterinarian may cause the livestock to be destroyed or disposed of in a manner designed to protect the health of other livestock.
Id. § 6-3.
 If the State Veterinarian determines that any livestock is infected with or has been exposed to any contagious or infectious disease, the owner or person in control of the livestock may be directed by the State Veterinarian or any authorized agent thereof, to disinfect any livestock or any place the livestock has been in a specific time and manner.
Id. § 6-4(A).
¶ 4 Regarding animal quarantines specifically, the ODA is authorized as follows:
 Whenever it is determined by the State Board of Agriculture or the State Veterinarian that livestock in any area of the State of Oklahoma is, has been, or is likely to be infected with an infectious or contagious disease, or has been exposed due to importation of livestock from another state or from another area in the State of Oklahoma, or for any other reason, the President of the Board, an authorized agent, or the State Veterinarian shall issue an order of quarantine showing the area and the conditions of the quarantine.
Id. § 6-124(A) (emphasis added).
 It shall be unlawful and a misdemeanor for any person to remove, change the location of, or to bring into or to take out of any place or area that has been quarantined, any livestock covered by the order of quarantine or to violate any of the conditions of the quarantine.
Id. § 6-125.
¶ 5 With regard to foreign animal diseases, the ODA has the following quarantine authority:
 If the State Board of Agriculture or any authorized agent thereof determines any animal or livestock in any area is or might be infected with any foreign animal disease, a quarantine may be declared by the Board. The quarantine shall show the area quarantined and the conditions of the quarantine.
Notice of the quarantine shall be given in person by an authorized agent, by certified mail, by a sign or signs posted in or around the quarantined area, or by publication in a legal newspaper of general circulation in one or more counties in which the area may be situated. It shall be illegal to remove any sign or notice posted to a quarantined area or premises unless removed by the State Veterinarian or an authorized agent.
Id. § 6-134 (emphasis added).
¶ 6 The constitutionality of animal quarantine provisions has been upheld by the Oklahoma Supreme Court. See Stine v. Lewis,127 P. 396, 401 (1912). The above cited statutory authority grants to the ODA broad powers with regard to the manner and conditions in which an animal quarantine is implemented. The term "quarantine" is defined as:
 [A] written document issued by the Board to restrict the movement of animals, birds, plants, or agricultural commodities into or out of a specified area for the control or prevention of diseases or pests[.]
2 O.S. Supp. 2000, § 1-3[2-1-3](12) (emphasis added).
¶ 7 The ODA has the authority to set the conditions of an animal quarantine which specifically includes the authority to "restrict the movement of animals." Id. No specific statutory authority or administrative rules currently exist which grant the ODA the authority to restrict the movement of people. An agency, however, may have implied powers not specifically granted by statute. "The authority will be implied if necessary for the due and efficient exercise of powers expressly granted or if it may be fairly implied from the statutory language." City of Hugo v.State ex rel. Pub. Employees Relations Bd., 886 P.2d 485, 492
(Okla. 1994). Restrictions on the movement of individuals implicate the fundamental right to travel, guaranteed by the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution. United States v. Guest,383 U.S. 745, 757-58 (1966). "Where fundamental rights and liberties are involved, classifications which might restrain them must be strictly scrutinized." Thayer v. Phillips Petroleum Co.,613 P.2d 1041, 1045 (Okla. 1980). See also 3 Norman J. Singer, Statutes and Statutory Construction § 58:4 (6th ed. 2001) ("statutes which impinge on fundamental freedoms are strictly construed"). In light of the absence of restrictions on human movement from the definition of quarantine and the implications of such restrictions for the right to travel, we conclude that there is no implied authority for the ODA to restrict the movements of human beings as part of quarantine regulations.
¶ 8 While the ODA does not have the authority to restrict the movement of people in the event of an outbreak of FMD, legitimate restrictions on the movement of animals may have an impact on the movement of people. For example, the authority to restrict the movement of animals could give rise to a regulation prohibiting the transportation of potentially contagious animals out of the quarantine area. This prohibition would have the incidental effect of limiting the movements of persons hauling such animals. Whether any particular restriction is reasonable and necessary is a question of fact outside the scope of this Attorney General's Opinion. 74 O.S. Supp. 2000, § 18b[74-18b](A)(5).
 III. The Oklahoma Civil Defense And Emergency Resources Management Act
¶ 9 Title 63 O.S. 1991 Supp. 2000, §§ 683.1 — 683.34 contain the Oklahoma Civil Defense and Emergency Resources Management Act ("Emergency Resources Management Act"). The Emergency Resources Management Act was declared necessary:
 Because of the existing and increasing possibility of the occurrence of disasters of unprecedented size and destructiveness resulting from enemy attack, sabotage, or other hostile action, from fire, flood, tornado, earthquake, or from other causes, in order to ensure that preparations of this state will adequately deal with such disasters and emergencies, to generally provide for the common defense and to protect the public peace, health, and safety, to preserve the lives and property of the people of this state, and to carry out the objectives of state and national survival and recovery in the event of enemy attack. . . .
63 O.S. Supp. 2000, § 683.2[63-683.2](A) (emphasis added).
¶ 10 There are several definitions which must be examined to determine the extent and nature of the Emergency Resources Management Act. The first definition is that of "civil defense" which is defined as:
 [T]he preparation for and the carrying out of all emergency functions, other than functions for which the military services are primarily responsible, by organized and trained volunteer civilian persons, who will extend existent governmental functions and provide other necessary nongovernmental functions, to prevent, minimize and repair injury and damage resulting from enemy attack, sabotage, or other hostile action, or disasters caused by fire, flood, tornado, earthquake, or other causes developing to such an extent to cause an extreme emergency situation to arise which by declaration of the Governor jeopardizes the welfare of the citizens of this state. These emergency functions include, but are not limited to, fire fighting services, police services, medical and health services, rescue, engineering, air raid warning services, communications, radiological, chemical and other special weapons of defense, evacuations of persons from stricken areas, emergency welfare services, civilian war aid, emergency transportation, existing or properly assigned functions of plant protection, integration of industry emergency plans into civil defense plans, assistance to private and public utility companies in the temporary restoration of public utility services, and other functions related to civilian protection, together with all other activities necessary or incidental to the preparation for and carrying out of the emergency functions[.]
Id. § 683.3(1) (emphasis added).
¶ 11 The term "Civil defense emergency" is defined as:
 [A]ny state of emergency caused by enemy attack upon the United States or a state of emergency declared by the President of the United States or the Governor of Oklahoma upon the occurrence of an attack upon the United States or when such attack is imminent or when an emergency is caused by a disaster. A civil defense emergency terminates upon declaration of the Governor of Oklahoma or concurrent resolution of the Oklahoma Legislature to such effect, or at the end of thirty (30) days if not renewed by the Governor or the Legislature, with the following exception: A proclamation of the Governor establishing a civil defense emergency, when an enemy attack upon the United States is imminent, shall not be issued on a legislative day when the Oklahoma Legislature is in session without first being approved by concurrent resolution of the Legislature. A proclamation of the Governor terminating a civil defense emergency for an enemy attack upon the United States shall not be issued during the time that the Oklahoma Legislature is in session without first being approved by concurrent resolution of the Legislature[.]
Id. § 683.3(3) (emphasis added).
¶ 12 The term "Emergency" is defined as:
 [A]ny occasion or instance for which, in the determination of the President of the United States or the Governor of the State of Oklahoma, federal or state assistance is needed to supplement state and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert threat of a catastrophe in any part of the state[.]
Id. § 683.3(4) (emphasis added).
¶ 13 And, the term "Natural disaster" is defined as:
 [A]ny natural catastrophe, including, but not limited to, a tornado, storm, high water, flood waters, wind-driven water, earthquake, landslide, mudslide, snowstorm, or drought which causes damage of sufficient severity and magnitude to warrant hazard mitigation or the use of resources of the federal government, or the state and political subdivisions thereof to alleviate the damage, loss, hardship or suffering caused thereby[.]
Id. § 683.3(9) (emphasis added).
¶ 14 The Emergency Resources Management Act creates the Oklahoma Department of Civil Emergency Management, authorizes the appointment of a Director, and sets the Director's duties. Id.
§ 683.4(A). The Emergency Resources Management Act also creates an Advisory Council which is composed of the Governor, The Director of the Department of Civil Emergency Management, the Commissioner of Public Safety, the Adjutant General, the Commissioner of Health, the President of the Board of Agriculture, the Director of the Department of Human Services, the Director of the Department of Transportation, and the Director of the Oklahoma Water Resources Board. Id. § 683.6(A). A State Hazard Mitigation Team is also created. Id. § 683.6(C).
¶ 15 The Emergency Resources Management Act provides for the creation of the Oklahoma Department of Civil Emergency Management, local organizations for civil defense, the formulation of a plan for emergency resources management, and the rendering of mutual aid between local, state and federal agencies and political subdivisions. Id. § 683.2(A) (1-3, 5).
¶ 16 The Governor is responsible for carrying out the provisions of the Emergency Resources Management Act and "[i]n the event of a civil defense emergency beyond local control," the Governor may control all civil defense functions in the State.Id. § 683.8(A). Specifically, the Governor is authorized to:
 Cooperate with the President of the United States and the heads of the Armed Forces, the Federal Emergency Management Agency, and other appropriate federal officers and agencies, with the officers and agencies of other states in matters pertaining to the emergency management of resources of the state and nation and the civil defense of the state and nation, including the direction and control of:
 a. blackouts and practice blackouts, air raid drills, mobilization of civil defense forces, and other tests and exercises,
 b. warnings and signals for drills or attacks and the mechanical devices to be used in connection therewith,
 c. the conduct of civilians and the movement of and cessation of movement of pedestrians and vehicular traffic during, prior and subsequent to drills or attacks,
d. public meetings or gatherings, and
 e. the evacuation and reception of the civil population[.]
Id. § 683.8(D)(8) (emphasis added).
¶ 17 The Governor has additional powers in the event of a "civil defense emergency." Title 63 O.S. 1991, § 683.9[63-683.9]
provides:
 The provisions of this section shall be operative only during the existence of a civil defense emergency. The existence of such civil defense emergency may be proclaimed by the Governor or by concurrent resolution of the Legislature if the Governor in such proclamation, or the Legislature in such resolution, finds that an attack upon the United States has occurred or is anticipated in the immediate future. Any such emergency, whether proclaimed by the Governor or by the Legislature, shall terminate upon the proclamation of the termination thereof by the Governor, or by passage by the Legislature of a concurrent resolution terminating such emergency. During such period as such state of emergency exists or continues, the Governor shall have and may exercise the following additional emergency powers:
 (a) To activate the Oklahoma Emergency Resources Management Plan, and to assume regulatory control over all essential resources of this state, directly or through the boards, agencies, offices and officers established by said Emergency Resources Management Plan, to determine priorities of such resources and allocate such resources as the Governor may deem necessary in cooperation with the political subdivisions of this state, the federal government, or other states. "Resources" shall mean all economic resources within this state including but not limited to food, manpower, health and health manpower, water, transportation, economic stabilization, electric power, petroleum, gas, and solid fuel, industrial production, construction and housing.
 (b) To enforce all laws, rules and regulations relating to civil defense and emergency resources management and to assume direct operational control of any or all civil defense forces and helpers in this state.
 (c) To provide for the evacuation of all or part of the population from any stricken or threatened area or areas within this state and to take such steps as are necessary for the receipt and care of such evacuees.
 (d) Subject to the provisions of the State Constitution, to remove from office any public officer having administrative responsibilities under this act for willful failure to obey any order, rule or regulation adopted pursuant to this act. Such removal shall be upon charges after service upon such person of a copy of such charges and after giving him an opportunity to be heard in his defense. Pending the preparation and disposition of charges, the Governor may suspend such person for a period not exceeding thirty (30) days. A vacancy resulting from removal or suspension pursuant to this section shall be filled by the Governor until it is filled as otherwise provided by law.
 (e) To perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population and to carry out the provisions of the Oklahoma plan for the management of resources in a national emergency.
Id. (footnote omitted).
¶ 18 The authority of the Governor is quite broad under the Emergency Resources Management Act. In certain instances, the Governor is specifically authorized to control "the conduct of civilians and the movement of and cessation of movement of pedestrians and vehicular traffic during, prior and subsequent to drills or attacks[.]" 63 O.S. Supp. 2000, § 683.8[63-683.8](D)(8)(c). Certainly, the primary intent of the Emergency Resources Management Act is to prepare for the civil defense of the State in the event of enemy attack or a natural disaster. If FMD is introduced to the animal population as a result of a hostile attack, the provisions of the Emergency Resources Management Act — including the powers granted to the Governor — apply. Whether, however, a catastrophic animal disease rises to the level of the type of emergency as defined by "civil defense," "civil defense emergency," "emergency," or "natural disaster" is not a question of law. Rather, such determination is a question of fact which cannot be answered in an Attorney General's Opinion. 74 O.S.Supp. 2000, § 18b[74-18b](A)(5). Therefore, this Opinion does not address whether a naturally occurring outbreak of FMD constitutes an emergency triggering the provisions of the Emergency Resources Management Act.
 IV. State Entities With The Authority To Restrict The Movement Of People Or Animals
¶ 19 Your second question asks, if the movement of people may be restricted during an outbreak of FMD, what State entity has the authority to impose such restriction? The Oklahoma Constitution, at Article VI, § 6 provides:
 The Governor shall be Commander-in-Chief of the militia of the State, except when in service of the United States, and may call out the same to execute the laws, protect the public health, suppress insurrection, and repel invasion.
Id. Accordingly, the militia may be called upon by the Governor to "protect the public health" of the State.
¶ 20 The State Board of Health, pursuant to 63 O.S. 1991, §1-504[63-1-504], has the authority to place a quarantine on the premises where a person usually stays if a local health officer determines or suspects that the person has a communicable disease. FMD, however, is not a human communicable disease. Therefore, there are no current statutory provisions which give the Department of Health the authority to restrict the movement of people or quarantine people in the event of an outbreak of an animal disease.
¶ 21 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. The Board of Agriculture has the explicit authority torestrict the movement of animals to prevent the spreading of acontagious animal disease. Okla. Const. art. VI, § 31; 2 O.S.Supp. 2000, § 2-4[2-2-4]; 2 O.S. Supp. 2000, § 6-4(A); 2 O.S.Supp. 2000, § 6-124. Foot and mouth disease is a foreign animaldisease and the Board of Agriculture may declare a quarantine torestrict the movement of animals to prevent the spread of thedisease. 2 O.S. Supp. 2000, § 6-134. A regulation restrictingthe movement of a person who is transporting a contagious animalmay be reasonably and necessarily implied from such authority.Whether, however, any particular restriction is reasonable andnecessary is a question of fact outside the scope of thisAttorney General's Opinion. 74 O.S. Supp. 2000, § 18b(A)(5).
 2. If the foot and mouth disease is introduced to the animalpopulation as a result of a hostile enemy attack, the provisionsof the Oklahoma Civil Defense and Emergency Resources ManagementAct, 63 O.S. 1991 Supp. 2000, §§ 683.1 — 683.34 apply.
 3. Whether a naturally occurring catastrophic animal disease,such as the foot and mouth disease, rises to the level of thetype of emergency as defined by the Oklahoma Civil Defense andEmergency Resources Management Act is a question of fact whichcannot be answered in this Attorney General's Opinion. 74 O.S.Supp. 2000, § 18b(A)(5).
 4. If the imposition of the State's police power inrestricting the movement of people in the event of an outbreak ofthe foot and mouth disease is appropriate, the Governor may callout the militia to protect the public health. Okla. Const.art. VI, § 6.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
GRETCHEN ZUMWALT SMITH ASSISTANT ATTORNEY GENERAL